549 S.E.2d 57

**Floyd WHORTON and Mildred Whorton, His Wife, Plaintiffs Below, Appellants,**

v.

**Carol MALONE, Individually and DBA Carol's Beauty Salon; Kimberly S. Bradfield and Her Husband, Robert W. Bradfield; Jayne Wagoner and Her Husband, Brian Wagoner; Wanda J. Dowden, Individually and DBA Dowden Heights, James W. Dowden, Jr., Individually and DBA Dowden Heights; John Doe, DBA Sunrise Heights Subdivision, Defendants Below, Appellees.**

No. 28724.

Supreme Court of Appeals of West Virginia.

Submitted April 4, 2001.

Decided June 15, 2001.

Lawrence E. Sherman, Jr., Esq., Romney, West Virginia, Attorney for Appellants.

V. Alan Riley, Esq., Keyser, West Virginia, Attorney for Appellee Carol Malone.

McGRAW, Chief Justice:

Appellants Floyd and Mildred Whorton, plaintiffs below, appeal a March 15, 2001, order of the Circuit Court of Mineral County granting summary judgment in favor of certain defendants below. The Whortons filed suit against several neighboring landowners for flooding and water damage to their home and property, which they alleged was caused by the acts and omissions of the defendants in controlling the flow of water on the various properties. Because we find that questions of material fact remain in dispute, we reverse.

1. We shall use the term "channel" in an effort to use a neutral term.

2. The Whortons also sued members of the Dowden family, who were alleged to have developed a subdivision known as Dowden Heights on land some distance behind, and upstream of, the

## I.

## BACKGROUND

On the seventh day of July, 1993, appellants Floyd and Mildred Whorton purchased a home in Fort Ashby, Mineral County, West Virginia. Because this case concerns the local geography, we describe the location of the parties' properties in some detail.

As in most of West Virginia, the properties in question are located on a slope. West Virginia Route 46 runs along the lower edge of this slope, and Dowden Drive leaves Route 46 at a right angle and travels uphill. The Whorton property is located at the intersection between Route 46 and Dowden Drive. The property of appellee Carol Malone is adjacent to the Whorton property, on the side opposite Dowden Drive, and also fronts on Route 46.

A water course, described at various times by the parties as a channel, ditch, rut, or stream,[1] runs across the Malone property, near and roughly parallel to the Malone/Whorton property line, passes into a culvert running along Route 46, and eventually flows through a pipe or culvert running beneath Route 46. At least at the time the dispute began, this channel was not lined with any rock, concrete, or other impervious material.

The Whortons claim that they experienced no problems with flooding or excessive soil moisture from the time they bought the house in 1993 until some time later, when neighboring property owners made changes to the land upstream. Although the neighboring Malone residence existed prior to 1993, the Whortons allege that at the time they purchased the property, no road ran behind the property and there were no other roads or structures within 500 yards of their home.[2]

In 1995, appellees the Bradfields constructed or had constructed a road called

Whorton property. Though the Whortons do not develop the details of how the Dowdens may have contributed to the flooding problem, they make a general allegation that the activities conducted on the Dowden land caused injury to the Whortons.

Sunset Road or Drive behind and above the Malone and Whorton properties, running roughly parallel to Route 46 and roughly perpendicular to Dowden Drive. Along with the construction of Sunset Drive, the builders constructed a drainage ditch along the road, on or next to the Malone property. Furthermore, they inserted a pipe or culvert under the new road allowing water to flow beneath the road, into the new drainage ditch, and eventually into the channel in question that ran near the Malone/Whorton property line.

The Whortons allege that beginning in the winter of 1995–96 that the changes made upstream caused an increase in the amount of water coming down the hill, which damaged their property. In response, the Whortons contacted a representative of the Mineral County Planning Commission [3] who engaged in a series of discussions with the other landowners in an effort to remedy the Whortons' problems.

At some point, the State of West Virginia replaced the culvert beneath Route 46, apparently in an effort to increase the carrying capacity and to lessen the chance of water backing up upon the Whorton property. Also, during this period, the Bradfields increased the size of the culvert running beneath Sunset Drive, apparently in an effort to respond to requests made by the county planning commission.

Sometime in 1997, upstream neighbors and appellees, the Wagoners, also developed their property along Sunset Drive. In an effort to allow the proper drainage of their property, they constructed a drainage ditch that also emptied into the Sunset Drive culvert, and eventually into the Malone/Whorton channel. Apparently the Whortons and Wagoners had a dispute over the propriety of the new Wagoner ditch. The record indicates that the Wagoners had some contact with the West Virginia Department of Natural Resources over the need for a permit to construct their ditch. It appears that the Wagoners and

Carol Malone had initially agreed to make improvements to the Malone/Whorton channel to increase its carrying capacity. The Whortons tried to persuade their neighbors to line the channel with impervious material, but apparently the Wagoners and Malone could not agree on payment arrangements and the channel was never lined.

The Whortons continued to experience problems from the increased water flow, and unable to resolve this problem with their neighbors, the Whortons had to sue, filing suit in the Circuit Court of Mineral County. The court initially granted summary judgment to Carol Malone, the Bradfields, and the Wagoners on September 2, 1999, and issued a final order on March 15, 2000, denying the Whortons' motions to alter or amend judgment. The Whortons now appeal from this order, with respect to defendants Malone, Bradfield, and Wagoner only.[4]

## II.

### STANDARD OF REVIEW

Our standard of review for a lower court's grant of summary judgment is well established.

"A circuit court's entry of summary judgment is reviewed *de novo*." Syl. pt. 1, *Painter v. Peavy*, 192 W.Va. 189, 451 S.E.2d 755 (1994). A party moving for summary judgment faces a well-established burden: "A motion for summary judgment should be granted only when it is clear that there is no genuine issue of fact to be tried and inquiry concerning the facts is not desirable to clarify the application of the law." Syl. pt. 3, *Aetna Cas. & Surety Co. v. Federal Insur. Co. of New York*, 148 W.Va. 160, 133 S.E.2d 770 (1963).

*Mallet v. Pickens*, 206 W.Va. 145, 147, 522 S.E.2d 436, 438 (1999).

---

**3.** W. Va.Code § 8–24–16 (1969) permits a county planning commissions to include drainage concerns in any comprehensive plan made for development within the county.

**4.** The lower court also granted summary judgment in favor of defendant below James W. Dow-

den, Jr., which the Whortons apparently do not contest. It appears from the record that defendants below Wanda J. Dowden, and the business entities alleged to be owned or operated by the Dowdens, have not been dismissed or granted summary judgment by the lower court.

■■ When we examine the facts as alleged by the parties in an appeal of a grant of summary judgment, we are compelled to favor the view presented by the defeated party. "In determining on review whether there is a genuine issue of material fact between the parties, this Court will construe the facts 'in a light most favorable to the losing party.'" *Alpine Property Owners Association, Inc. v. Mountaintop Development Company*, 179 W.Va. 12, 17, 365 S.E.2d 57, 62 (1987) (quoting *Masinter v. WEBCO Co.*, 164 W.Va. 241, 242, 262 S.E.2d 433, 435 (1980)).

## III.

### DISCUSSION

Central to this case is the fundamental law that water runs downhill, and so do the benefits or problems associated with it. Appellants allege that the various appellees, through their actions and inactions, altered, or allowed to be altered, the natural flow of water upon their various properties in such a way that it damaged the land, home, and personal property of the appellants.

■■ First, we note that negligent diversion of surface water is subject to the same analysis that we would apply to any other activity that could damage another:

One is answerable for the ordinary and proximate consequences of his negligence, and this liability includes all those consequences which may have arisen from the neglect to make provision for dangers which ordinary skill and foresight are bound to anticipate.

Syl. pt. 1, *Adkins v. City of Hinton*, 149 W.Va. 613, 142 S.E.2d 889 (1965).

■■ It is well settled that one may not alter the natural flow of water and injure the property of a neighbor. "One can not negligently obstruct or divert the water of a natural course to the injury of another without liability." Syl. pt. 1, *Atkinson v. C. & O. Ry. Co.*, 74 W.Va. 633, 82 S.E. 502 (1914). Be it 1914 or 2001, this basic premise holds true.

In a case where a railroad had constructed an embankment in such a manner as to flood a neighbor's property we held:

A railroad company makes an embankment in a street on which to lay its track, and so negligently constructs it as to obstruct or close a culvert already there for passage of water, and by reason thereof at times water from rain or snow collects and floods an adjoining lot. Its owner may recover damages.

Syl. pt. 6, *Henry v. Ohio River R. Co.*, 40 W.Va. 234, 21 S.E. 863 (1895). In *Henry*, the railroad had obstructed the flow of water such that water would back up and flood the lands of Mr. Henry, an upstream neighbor. We recognized that, even in 1895, well settled was the idea that one could not conduct activity on one's land that would result in damage to the lands of another:

That, though a work of improvement, like a railroad, is lawful and under authority, yet, if damage result to an individual by overflow of water by reason of negligent construction, he can recover, is well settled. *Gillison v. City of Charleston*, 16 W.Va. 282; *Knight v. Brown*, 25 W.Va. 808; *Taylor v. Railroad Co.*, 33 W.Va. 39, 10 S.E. 29. It is only an application of the maxim: "So use your own property or right that you do not injure another."

*Id.*, 40 W.Va. at 245, 21 S.E. at 867 (1895). The passage of over one hundred years has only served to reinforce the wisdom of this maxim.

■■ In the more modern case of *Morris Assocs., Inc. v. Priddy*, 181 W.Va. 588, 383 S.E.2d 770 (1989), this Court discussed at great length the evolution of the law since the turn of the last century. We discussed the tension between the "civil" rule that one could not injure one's neighbor by increasing the flow of water onto the neighbor's property, and the "common enemy" rule that one could do anything one had to do to protect oneself from surface waters, without liability for the injury of one's neighbor. Ultimately, we adopted the so-called "reasonable use" rule, finding that landowners still must act reasonably toward their neighbors with respect to the use or diversion of water, and that a jury is usually asked to determine the propriety of one's actions:

Generally, under the rule of reasonable use, the landowner, in dealing with surface water, is entitled to take only such steps as are reasonable, in light of all the circumstances of relative advantage to the actor and disadvantage to the adjoining landowners, as well as social utility. Ordinarily, the determination of such reasonableness is regarded as involving factual issues to be determined by the trier of fact. To the extent that *Jordan v. City of Benwood*, 42 W.Va. 312, 26 S.E. 266 (1896), differs, it is overruled.

Syl. pt. 2, *Morris Assocs., Inc. v. Priddy*, 181 W.Va. 588, 383 S.E.2d 770 (1989).

In the case before us, the Whortons made allegations that Carol Malone, the Bradfields, and the Wagoners took the water upon their lands and cast it negligently upon the Whortons' property. The record indicates that the Bradfields constructed a road and cleared some lots for development. The record also shows that the Wagoners cleared at least part of their land and directed storm water away from their land and toward the Whortons'. It is quite obvious that constructing roads and clearing land can significantly change the amount of water the land can absorb during a storm, and the amount of water that will run off.[5]

■ In the instant case, the Whortons allege, in part, that the actions or inactions of their immediate neighbor Carol Malone were the cause of some of their damage. In its order granting summary judgment to Carol Malone, the lower court noted that the only allegation the plaintiffs made against Ms. Malone was that "she allowed the construction of the culverts upon her property." It is understandable that the lower court in this case, as a jury might do in another case, may have presumed that Ms. Malone could not be liable because the water in question did not originate on her property. But our law contains no requirement that a problem with surface water must originate on the lands of a defendant before that defendant is liable for damage to the lands of the plaintiff.

■ In a case where we found a city liable for flooding damage to a citizen because of a change in the grade of a city street, we rejected a similar argument about the origin of the damaging water:

Here the evidence proves that the greater part of the water cast upon plaintiff's premises doing the injury complained of came into Princeton Avenue from other streets, not only draining land above plaintiff's property, from which the natural flow of waters would have come upon his lot, but also draining other lands from which the natural flow would have gone elsewhere.

*Mason v. City of Bluefield*, 105 W.Va. 209, 211–12, 141 S.E. 782, 783 (1928). It is an inescapable fact of nature that, surface water "originates" elsewhere. It either falls from the sky, comes up from a spring, or flows from a higher grade to a lower one. But whether it comes from a cloud, spring, or an upstream neighbor, once that water arrives upon a given property, that property owner "is entitled to take only such steps as are reasonable," in diverting it.

---

5. We note that had the appellants lived just a few miles away, across the Potomac in the State of Maryland, their actions might have been subject to a mandatory storm water management plan and a permitting process. In Maryland, the state legislature has enacted legislation to prevent problems such as those faced by the Whortons:

The General Assembly finds that the management of stormwater runoff is necessary to reduce stream channel erosion, pollution, siltation and sedimentation, and local flooding, all of which have adverse impacts on the water and land resources of Maryland. The General Assembly intends, by enactment of this subtitle, to reduce as nearly as possible the adverse effects of stormwater runoff and to safeguard life, limb, property, and public welfare.

Md.Code Ann., Envir. 4–201 (1993). The rest of the code section sets forth tough restrictions on developers to prevent stormwater from damaging neighboring landowners. Florida has a similar provision, which may be found at Fla. Stat. Ann. §§ 403.0891 through 403.0896 (1989). Also, the federal government is in the process of implementing new rules under the Clean Water Act that will require, by March of 2003, most private construction activities that disturb more than one acre of land to meet stringent permit requirements to reduce the problems associated with stormwater run-off. *See, generally*, 33 U.S.C. 1251, *et seq.*, and 40 C.F.R. § 122.21, *et seq.* (1999).

 Some might argue that Ms. Malone could have changed the culverts in any fashion she wished without liability because the damaging water came onto her land from above, but that is not what our law has established. If a property owner makes changes to the natural state of his or her land, he or she may be liable if that water damages a neighbor, regardless of where the water "originated." Thus we hold that when a plaintiff alleges that a defendant has caused or allowed surface water to damage the plaintiff, the mere fact that the water does not "originate" on the land of the defendant, does not, in and of itself, make the defendant's conduct "reasonable" under the test established in *Morris Assocs., Inc. v. Priddy*, 181 W.Va. 588, 383 S.E.2d 770 (1989).

 Finally, we gather from the record and the lower court's grants of summary judgment that the outcome of this litigation was colored by the notion that the activities of the defendants were reasonable, merely because their intent was to solve their own water problems, not to injure their neighbors. Motions for summary judgment allege that the Whortons failed to take any actions to mitigate their water problems, and the lower court's final order found the complaint to be "extremely flawed." [6]

We agree that, in layman's terms, it is "reasonable" for a landowner to want to solve his or her own surface water problems, and that the upstream defendants in this case probably had no intention of harming their downstream neighbors. But again, this is not the test required by our law. In a case with very similar facts to the instant dispute we explained that a defendant's "reasonable"

intentions to protect himself did not render his conduct in diverting surface water to the detriment of his neighbor a "reasonable" use under our law.

 In that case, the defendant had to combat water flowing onto the rear of his property from an adjoining alley. To remove the water from his property he dug or enlarged a ditch that ran along his common property line with the plaintiff, at the foot of a stone wall. The plaintiff, fearing the wall would be damaged, asked the defendant to take steps to protect the plaintiff's property, but the defendant refused. In time, the water caused the wall to fall and the plaintiff sued. We rejected the defendant's argument that his efforts to protect himself did not make him liable for the plaintiff's damages:

> The defendant insists that he is not liable for the reason that the ditch was dug upon his own land, and that he was under no obligation to furnish lateral support to plaintiff's lot, burdened as it was by this stone wall, but only in its natural state, and that inasmuch as the plaintiff knew that her lateral support was being taken away she was under the obligation to take such steps as might be necessary to protect her wall.... Now, there is no doubt that the defendant had a right to dig a ditch upon his own land for the purpose of carrying off the surface water, or for any other proper purpose, but when he does this he must so construct his drain or ditch as that it will not encroach upon the adjoining owner and do him damage. If it does so encroach, he will be liable for the resulting injury.

---

6. When the lower court granted summary judgment, it noted that the plaintiffs first had alleged that the culverts in question were too wide, and then their expert testified that the culverts were undersized or installed improperly. The court then made a finding of fact that the limited carrying capacity of the culverts could not have damaged the plaintiffs. But actually the plaintiffs made a general allegation that the defendants' actions in diverting surface water caused the plaintiffs damage. After describing the history of the dispute in their complaint, the Whortons alleged:

> The acts and/or omissions of the Defendants individually and collectively, and the conduct

as described aforesaid, [the construction of the road, the installation of culverts, the digging of ditches, etc.] violates the Defendants' duty to maintain their land and real estate in such a away as not to interfere with or damage the house and land of the Plaintiffs.

It is well established that "[c]omplaints are to be read liberally as required by the notice pleading theory underlying the West Virginia Rules of Civil Procedure." *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 461 S.E.2d 516 (1995); *Accord, Mandolidis v. Elkins Indus., Inc.*, 161 W.Va. 695, 246 S.E.2d 907 (1978); *John W. Lodge Distrib. Co., Inc. v. Texaco, Inc.*, 161 W.Va. 603, 245 S.E.2d 157 (1978).

*Manley v. Brown,* 90 W.Va. 564, 566–67, 111 S.E. 505, 506 (1922). Thus, to clarify the state of our law for future jurors considering such a dispute we hold that, in the absence of a valid waiver or other contractual arrangement, altering the natural flow or drainage of surface water upon one's land such that the water causes damage to another party is not "reasonable" merely because the person altering the flow of water sought to protect his or her own property and did not intend to harm any other party.

The instant case provides an example of a common dispute over storm water. Water may come from several areas, each under the control of a different landowner. The best means of controlling excess run-off may not lie upon the land of the party most damaged by the water. Efforts made by one landowner to solve his or her problems may exacerbate the problems of a neighbor. Because of the interconnected nature of these disputes, questions of material fact often exist with regard to liability, as they do in the instant case. Because we find that significant questions of material fact exist with respect to the liability of all the named defendants in this case, we reverse the judgment of the Circuit Court of Mineral County, and remand this case for proceedings consistent with this opinion.

## IV.

### CONCLUSION

For the reasons stated, the judgment of the Circuit Court of Mineral County is reversed and remanded for further proceedings consistent with this opinion.

Reversed and remanded.