**RIDGE LINE, INC., Plaintiff–Appellant,**

v.

**UNITED STATES, Defendant–Appellee.**

No. 03–5015.

United States Court of Appeals, Federal Circuit.

DECIDED: Oct. 10, 2003.

William C. Porth, Robinson & McElwee, PLLC, of Charleston, WV, argued for plaintiff-appellant. With him on the brief were Kent J. George and Matthew S. Casto.

Mark R. Haag, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Thomas L. Sansonetti, Assistant Attorney General; Stuart B. Schoenburg, and Katherine J. Barton, Attorneys. Of counsel on the brief was William B. Neel, Attorney, Office of the General Counsel, United States Postal Service, of Washington, DC.

Robert A. Klimek, Jr., Klimek, Kolodney & Casale, P.C., of Washington, DC, filed an amicus brief for the West Virginia Land and Mineral Owners Council.

Before MICHEL, CLEVENGER, and BRYSON, Circuit Judges.

MICHEL, Circuit Judge.

Ridge Line, Inc. appeals from a judgment following trial by the United States Court of Federal Claims, *Ridge Line, Inc. v. United States*, No. 98–CV–929, 2002 U.S. Claims LEXIS 240 (Fed.Cl. Sept. 4, 2002), holding that increased storm drainage caused by the construction of a Postal Service facility and associated parking lots and driveways did not constitute a taking of any real property interest of Ridge Line that would justify compensation under the Takings Clause of the United States Constitution. U.S. Const. amend. V. The trial court found that the affected portion of Ridge Line's land, a ravine known as South Hollow, was not effectually destroyed nor suffered a permanent and exclusive occupation by the increased runoff from the federal land uphill from Ridge Line's property and that in any event Ridge Line failed to demonstrate quantified damages for any erosion injury to South Hollow or diminished resale value thereof. Because the trial court (1) failed to address whether the increased storm drainage constituted a taking of a flowage easement by inverse condemnation as expressly argued by Ridge Line and (2) rejected as a permissible basis of damages in any event the cost of the flood control structures Ridge Line built and twice expanded for prevention of further damage to its land, we vacate the trial court's judgment and remand for further analysis and decision consistent with this opinion.

## BACKGROUND

West Virginia is so mountainous that land development often leads to greatly increased flow and velocity of storm water runoff due to the reduced capacity of water absorption by the developed property. Ridge Line owns land on which is located Southridge Centre, the largest shopping center and mixed-use commercial development in West Virginia. In 1991, the government purchased a piece of property

adjacent to and uphill from the shopping center to build a United States Postal Service facility. Storm water from both the Postal Service property and Southridge Centre drains into South Hollow, which lies between the Postal Service property and the shopping center. At the time the Postal Service developed its property, Ridge Line owned only a portion of South Hollow. In the years following the construction of the Postal Service facility, other portions of South Hollow were also acquired by Ridge Line.

When the Postal Service facility was completed in late 1993, storm water runoff into South Hollow sharply increased due to the construction of impervious surfaces on much of the government land. Evidence was offered that the development increased the storm runoff by 70–150%. According to Ridge Line's evidence, approximately 80% of post-development runoff into South Hollow in 1993 was coming from the Postal Service property as opposed to Ridge Line's property. Although the Postal Service facility included a drainage swale and drains and the Postal Service constructed a check dam on Ridge Line's property in South Hollow to control runoff, Ridge Line notes that storm water runoff into South Hollow became so extreme that it began to receive complaints of flooding from downstream neighbors, including a homeowner along Davis Creek which is fed by the effluent from South Hollow.

In 1993, Ridge Line built a storm water detention pond in South Hollow. Ridge Line claims that it was forced to construct the water detention facilities much earlier and on a larger scale than would have been required without the increased runoff caused by the government development. It asked the Postal Service to share in the cost of constructing the detention facilities. However, negotiation failed over the issue of the amount of the government's contribution. In the end, the government refused to pay anything. Ridge Line then sued the government in the Court of Federal Claims on December 19, 1998 claiming that the additional water flow caused by the development of the Postal Service facility constituted a taking by the government of a flowage easement entitling it to compensation under the Takings Clause of the United States Constitution. The taking was alleged to have occurred in 1993. Ridge Line sought the costs it has incurred to deal with the government's runoff and reasonably projected costs to be incurred in the future.

Between 1994 and 2000, Ridge Line expanded the shopping center with more recreational facilities. It also built new, larger storm water management facilities in South Hollow. Even more recently, Ridge Line added additional landfill to South Hollow, covering the original storm water detention pond and most or all of the portions of South Hollow that it claims were damaged by the erosion caused by storm water discharge from the Postal Service property.

The trial court, after a site inspection in 2002 and a two-and-a-half-day trial,[1] found that the Postal Service development created at least a 70% increase in storm drainage onto Ridge Line's property. *Ridge Line*, 2002 U.S. Claims LEXIS 240, at *1.

---

1. The trial was held in Charleston, West Virginia on July 15–17, 2002. The trial court heard the parties' closing statements on August 13, 2002 in Washington, D.C. and issued its opinion and order on September 4, 2002. On October 8, 2002 the trial court denied Ridge Line's motion for reconsideration.

However, the trial court found that while the water might have "invaded" Ridge Line's property from time to time, the invasion was not sufficient to establish government "possession." *Id.* The court found also that Ridge Line did not suffer a permanent and exclusive occupation by the government that destroyed its possession, use, or disposal of its property, and that even if there were temporary invasions of the property, there was insufficient evidence of them because no loss of value of the property was shown and Ridge Line had already filled and altered the area complained of, obscuring the earlier erosion effects. *Id.* at *7–8. Further, the court found that Ridge Line could not prove damages because it did not produce appraisals of its property before and after the land erosion allegedly caused by the increased water runoff. *Id.* at *8–9.

After the trial court entered judgment for the government, Ridge Line timely appealed to this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## DISCUSSION

 A determination of whether a taking compensable under the Fifth Amendment has occurred is a question of law based on factual underpinnings. *Alves v. United States,* 133 F.3d 1454, 1456 (Fed. Cir.1998). Thus, we review the trial court's legal analysis and conclusion de novo and its fact-findings for clear error. *Bass Enters. Prod. Co. v. United States,* 133 F.3d 893, 895 (Fed.Cir.1998).

### I.

 Despite Ridge Line's contention that the taking in this case was the appropriation of a flowage easement by inverse condemnation, the trial court confined its analysis of liability to whether the government's actions constituted a "permanent and exclusive occupation." *See Ridge Line,* 2002 U.S. Claims LEXIS 240, at *7–8. A permanent and exclusive physical occupation of private land by or on the authority of the government is one incontestable case for compensation under the Takings Clause. *E.g., Boise Cascade Corp. v. United States,* 296 F.3d 1339, 1353 (Fed.Cir.2002). However, a permanent occupation need not exclude the property owner to be compensable as a taking. *See, e.g., Loretto v. Teleprompter Manhattan CATV Corp.,* 458 U.S. 419, 436–38, 102 S.Ct. 3164, 73 L.Ed.2d 868 (1982) (holding that a compulsory installation of cables on apartment buildings pursuant to a state statute constituted a taking). Nor must the occupation be continuous. Thus, for purposes of takings analysis, "a 'permanent physical occupation' has occurred ... where individuals are given a permanent and continuous right to pass to and fro, so that the real property may continuously be traversed, even though no particular individual is permitted to station himself permanently upon the premises." *Nollan v. Cal. Coastal Comm'n,* 483 U.S. 825, 831–32, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987).

 It is well established that the government may not take an easement without just compensation. *United States v. Dickinson,* 331 U.S. 745, 748, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947) ("Property is taken in the constitutional sense when inroads are made upon an owner's use of it to an extent that, as between private parties, a servitude has been acquired either by agreement or in course of time."); *Nollan,* 483 U.S. at 834, 107 S.Ct. 3141 (stating "requiring uncompensated conveyance of the easement outright would violate the Fourteenth Amendment" and holding that

conditioning a building permit upon a grant of an easement for public access across private beachfront property constituted a taking).

■ Similarly, government actions may not impose upon a private landowner a flowage easement without just compensation. *Dickinson*, 331 U.S. at 750–51, 67 S.Ct. 1382. In *Dickinson*, the government, in building a dam, raised the water level of a river, causing permanent flooding, erosion, and intermittent flooding of abutting landowners. *Id.* at 746–47, 67 S.Ct. 1382. Before the trial court, whose decision was affirmed by the United States Court of Appeals for the Fourth Circuit, the *Dickinson* landowners recovered judgments for the value of easements taken by the government to permanently flood parts of their lands, damages for erosion of the residues of their lands adjoining the flooded portions based on the cost of protective measures the landowners might have taken to prevent the erosion loss, and the value of easements for intermittent flooding of still other parts of their lands. *United States v. Dickinson*, 152 F.2d 865, 866 (4th Cir.1946). The Supreme Court granted certiorari, and affirmed all of the damages awarded to the landowners. *Dickinson*, 331 U.S. at 750–51, 67 S.Ct. 1382.

Three points made by the Supreme Court in *Dickinson* are particularly relevant to the present case. First, the Court affirmed the judgment and the value assessed for the government's taking of an easement by inverse condemnation for intermittent flooding of land. *Id.* at 751, 67 S.Ct. 1382. Second, the Court held that a landowner's reclaiming his land did not disentitle him to be compensated for the original taking committed by the government. *Id.* Third, regarding the compensa-

tion awarded for land erosion, the Court held that "[i]f the resulting erosion which, as a practical matter, constituted part of the taking was in fact preventable by prudent measures, the cost of that prevention is a proper basis for determining the damage, as the courts below held." *Id.*

In the present case, the trial court referred to *Dickinson*, but only in the context of rejecting the government's argument that Ridge Line's claim was barred by the statute of limitations. *Ridge Line*, 2002 U.S. Claims LEXIS 240, at *4–5. The trial court acknowledged that *Dickinson* involved a takings claim for "damages caused by intermittent flooding due to a dam's being built" and that "erosion caused by flooding [was] the cause of action." *Id.* It apparently recognized that *Dickinson* involved inverse condemnation; it noted that, in *Dickinson*:

> the Government could have condemned the property at any time, but it chose not to. The Government's inaction had "left the taking to physical events, thereby putting on the owner the onus of determining the decisive moment in the process of acquisition by the United States when the fact of taking could no longer be in controversy."

> "When the Government chooses not to condemn land but to bring about a taking by a continuing process of physical events, the owner is not required to resort either to piecemeal or to premature litigation to ascertain the just compensation for what is really 'taken.' "

*Id.* at *5–6 (quoting *Dickinson*, 331 U.S. at 748, 749, 67 S.Ct. 1382) (citations omitted). However, the trial court failed to discuss the relevance of *Dickinson* to the merits—not just the timeliness—of Ridge Line's claim for the taking of a flowage ease-

ment.[2]

The trial court likewise apparently saw no analogy between Ridge Line's claim that the government had appropriated an easement and the easement imposed by inverse condemnation in *Nollan.* *See Nollan,* 483 U.S. at 832, 834, 107 S.Ct. 3141. As noted above, in *Nollan* the government had conditioned its grant of a building permit on the owners' consent to grant the public an easement to pass across a portion of their beachfront property. *Id.* at 827–28, 107 S.Ct. 3141. The Court characterized as "obvious" that "requir[ing] the [owners] to make an easement across their beachfront available to the public on a permanent basis ... would have been a taking" and held that the same was true of the imposition of the access condition. *Id.* at 831, 841–42, 107 S.Ct. 3141. In short, the Court concluded "if [the government] wants an easement ..., it must pay for it." *Id.* at 842, 107 S.Ct. 3141.

## II.

■■■■ Turning to the present case, Ridge Line claims that the increased storm water runoff caused by the Postal Service development constituted the government's taking of a water flowage easement in 1993 and just compensation for the taking is a proportional share of the cost in building, expanding and maintaining the

flood control system in South Hollow. Before the trial court, as here, Ridge Line relied on *Nollan* and *Dickinson.*[3] However, the trial court failed to address Ridge Line's claim for inverse condemnation of a flowage easement even though it was so presented. This was error.

The trial court thus erred in requiring that to recover Ridge Line must show that its property was " 'effectually destroyed' " or suffered a " 'permanent and exclusive occupation by the government that destroyed the owner's right to possession.' " *Ridge Line,* 2002 U.S. Claims LEXIS 240, at *7 (quoting *Loretto,* 458 U.S. at 427, 102 S.Ct. 3164 and *Boise Cascade,* 296 F.3d at 1353). *Dickinson,* in holding that intermittent flooding of private land can constitute a taking of an easement, clearly established that permanent destruction or exclusive occupation by government runoff is not always required for a successful takings claim. *Dickinson,* 331 U.S. at 751, 67 S.Ct. 1382. Further, the trial court erred in stating that Ridge Line suffered no loss of use, possession, or value of its property because most of the area complained of as eroded by government runoff was later filled and altered. As *Dickinson* held, a landowner's reclaiming his land does not disentitle him to be compensated for the original taking by the government. *Id.* Moreover, the trial court erred in holding that damages could not be demonstrated

**2.** During discussions with counsel following the close of Ridge Line's case, the court observed that *Dickinson* was "remarkably similar in some respects" to the present case (Trial Transcript, at 406–07) and noted that *Dickinson* provides "support for the notion that there are other ways that you can value a taking"—namely "using the cost of these improvements" (*id.* at 415). In response, the government incorrectly distinguished *Dickinson* as applicable only where an appraisal establishes that the government's actions resulted in a diminution in value (*id.* at 407–08)

and failed to specifically address the court's observation about *Dickinson's* approval of damages based on the cost of measures taken to prevent erosion (*id.* at 416). The government, which abandoned its statute of limitations argument on appeal, apparently persists in its narrow view of *Dickinson,* as its brief does not mention the decision.

**3.** Ridge Line apparently did not cite *Nollan* until it filed its motion for reconsideration.

simply because Ridge Line did not provide appraisals of its land value before and after the erosion of South Hollow allegedly caused by the storm water overflow. Again, *Dickinson* specifically stated that if the land erosion caused by a taking is preventable, the cost of the prevention is a proper basis for determining damages. *Id.* at 750–51, 67 S.Ct. 1382. The trial court thus cannot rely on a lack of appraisals as a reason for its conclusion that no damage was proven and thus no taking occurred.

Thus, although the trial court seems to have properly determined that no taking occurred due to permanent and exclusive physical occupation by the government, it failed to address Ridge Line's principal contention: whether the increased water runoff constituted a taking of a flowage easement by inverse condemnation. We therefore vacate and remand for analysis of the evidence in accordance with the taking of a flowage easement by inverse condemnation.

## III.

 Ridge Line's assertion of a claim for inverse condemnation invokes a two-part analysis. First, Ridge Line must establish that treatment under takings law, as opposed to tort law, is appropriate under the circumstances. *See Barnes v. United States,* 210 Ct.Cl. 467, 538 F.2d 865, 870 (1976) (distinguishing between torts and takings; noting that "Government-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort"). The tort-taking inquiry in turn requires consideration of whether the effects Ridge Line experienced were the predictable result of the government's action, and whether the government's actions were

sufficiently substantial to justify a takings remedy. If these inquiries reveal that a takings remedy is potentially available, Ridge Line must show that it possessed a protectable property interest in what it alleges the government has taken. *See Murray v. United States,* 817 F.2d 1580, 1583 (Fed.Cir.1987) (holding that the government's failure to permit redemption of mortgaged property constituted a taking where the mortgagees possessed a property interest under state law). We consider each of these issues in turn.

## IV.

### A.

 "Inverse condemnation law is tied to, and parallels, tort law." 9 PATRICK J. ROHAN & MELVIN A. RESKIN, NICHOLS ON EMINENT DOMAIN § 34.03[1] (3d ed. 1980 & Supp. 2002). Thus, not every "invasion" of private property resulting from government activity amounts to an appropriation. *Id.* The line distinguishing potential physical takings from possible torts is drawn by a two-part inquiry. First, a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the "direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action." *Columbia Basin Orchard v. United States,* 132 Ct.Cl. 445, 132 F.Supp. 707, 709 (1955) (holding that a claim for the loss of fruit trees resulting from the contamination of a spring resulting from the combination of the government's discharge of water into a nearby lake and unprecedented rainfall was compensable, if at all, as a tort, not a taking); *Owen v. United States,* 851 F.2d 1404, 1418 (Fed.Cir.1988) (en banc) (remanding for a

determination of whether the claimant's property loss flowed from an intention to do an act the natural consequence of which was to take [the] property or was such an indirect consequence of [the governments action] as not to be a compensable taking). Second, the nature and magnitude of the government action must be considered. Even where the effects of the government action are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value. *See, e.g., Southern Pac. Co. v. United States,* 58 Ct.Cl. 428 (1923) (holding that damage to the claimants railroad resulting from construction of a breakwater at the mouth of a bay was consequential and not compensable as a taking, citing *John Horstmann Co. v. United States,* 257 U.S. 138, 145, 42 S.Ct. 58, 66 L.Ed. 171 (1921)), *affd,* 266 U.S. 586, 45 S.Ct. 124, 69 L.Ed. 454 (1924); *Drury v. United States,* 52 Fed. Cl. 402, 403–04 (2002) (agreeing that a plaintiffs claim against the government based on alleged wrongful acts including trespass and destruction of improvements on the plaintiffs land did not constitute a taking because the acts did not rise[ ] to the magnitude of an appropriation of some interest in his property for the use of the government. (quoting *BMR Gold Corp. v. United States,* 41 Fed. Cl. 277, 282 (1998))).

Here, since Ridge Line does not allege that the government intentionally appropriated its property, on remand the court must first determine whether Ridge Line proved that the increased storm runoff was the direct, natural, or probable result of the Postal Service development, rather than merely an incidental or consequential injury, perhaps compensable as a tort, caused, for example, by improvident conduct on the part of the government in managing its property. Specifically, the court must determine whether the increased runoff on the claimants property was the predictable result of the government action. *See Sanguinetti v. United States,* 264 U.S. 146, 149–50, 44 S.Ct. 264, 68 L.Ed. 608 (1924) (holding that no taking occurred where the claimant failed to show that increased flooding resulting from the governments construction of a canal was the direct or necessary result of the structure; [or] within the contemplation of or reasonably to be anticipated by the government). Thus a dam construction project resulting in an increase in the water levels of the lakes from which claimants had obtained and manufactured soda was not compensable as a taking where the result of the governments work to the properties ... could not have been foreseen or foretold.... *Horstmann Co.,* 257 U.S. at 142–43, 146, 42 S.Ct. 58 (noting that the movement of the percolating underground waters was hidden). However, where the construction and operation of a dam initiated a series of events, all ... in their natural order, by which the landowner was deprived of the beneficial use of portions of its land, a taking was found. *Cotton Land Co. v. United States,* 109 Ct.Cl. 816, 75 F.Supp. 232, 232–35 (1948).[4] The court in *Cotton Land* offered the following analysis:

---

**4.** In *Cotton Land,* water impounded in the reservoir created by the dam backed up into the feeding river, which, having lost its velocity at its junction with the reservoir, deposited its sand where it collided with the still water; the deposit of the sand placed another obstacle to the full and rapid flow of the river; this filling up of the bed of the river raised the level of its water; it over-

If engineers had studied the question in advance they would, we suppose, have predicted what occurred. If they had studied the question in advance and had said, in a report, "If you build Parker Dam to a crest of 450.4 feet, the pool will cover the land described below. The effect of the flow of the river into the pool will be to form a delta which, within approximately three years will raise the bed and the surface of the river, will cause it to overflow its banks and will thus inundate the lands described below," would the fact of that formal forewarning be a decisive fact in such a suit as this? Should the fact that the engineering study was not so complete as to include a prediction as to lands beyond the bed of the reservoir prevent a court from looking at the actual and natural consequences of the Government's act?

*Id.* at 233–34.

### B.

■■■ The second prong of the taking-tort inquiry in this case requires the court to consider whether the government's interference with any property rights of Ridge Line was substantial and frequent enough to rise to the level of a taking. *See BMR Gold,* 41 Fed.Cl. at 282. In this regard, "[i]solated invasions, such as one or two floodings . . ., do not make a taking . . ., but repeated invasions of the same type have often been held to result in an involuntary servitude." *Eyherabide v. United States,* 170 Ct.Cl. 598, 345 F.2d 565, 569 (1965) (citations omitted); *see also Barnes,* 538 F.2d at 870 (Generally speaking, property may be taken by the invasion

flowed its banks, they being low, and spread out over the company's land, it being still lower.

of water where subjected to intermittent, but inevitably recurring, inundation due to authorized Government action.).

### V.

■■■■ If the court concludes that treatment of the government's conduct as a potential taking, as opposed to a tort, is appropriate, it must then consider whether the government appropriated from Ridge Line a legally protectable easement interest, a determination made in this case according to West Virginia's "reasonable use" rule. In deciding whether one who alters his land is liable to his neighbor for flooding caused by the alterations, the Supreme Court of Appeals of West Virginia decided to "approach[ ] each case on its individual facts with a view toward finding if a reasonable use was being made of the property." *Morris Assocs., Inc. v. Priddy,* 181 W.Va. 588, 383 S.E.2d 770, 774 (1989).

Generally, under the rule of reasonable use, the landowner, in dealing with surface water, is entitled to take only such steps as are reasonable, in light of all the circumstances of relative advantage to the actor and disadvantage to the adjoining landowners, as well as social utility. Ordinarily, the determination of such reasonableness is regarded as involving factual issues to be determined by the trier.

*Id.* at 773 (citing *Page Motor Co., Inc. v. Baker,* 182 Conn. 484, 438 A.2d 739, 741 (1980)). Further,

altering the natural flow or drainage of surface water upon one's land such that the water causes damage to another party is not "reasonable" merely because

*Cotton Land,* 75 F.Supp. at 232–33.

the person altering the flow of water sought to protect his or her own property and did not intend to harm any other party.

*Whorton v. Malone,* 209 W.Va. 384, 549 S.E.2d 57, 64 (2001).

Here, the government effectively shifted some of its storm water control costs to Ridge Line. By covering much of its land with impervious surfaces but failing to build water retention facilities, the government, according to Ridge Line's evidence, forced Ridge Line to build larger, more expensive control facilities in South Hollow than would otherwise have been necessary.

There was also evidence that the government aggravated the consequences that would otherwise have befallen Ridge Line as a result of the Postal Service development by gathering and concentrating much of the storm water that fell on its property into five discharge points directed onto Ridge Line's property. This multiplied its erosive power, rather than restraining it. Furthermore, Ridge Line offered evidence that the government failed to maintain the check dam it built (with consent) on Ridge Line's property, despite the request of the West Virginia Division of Environmental Protection that the dam although intended to be temporary remain permanently and be maintained. On remand, the trial court must consider this and other evidence bearing on the reasonableness of the government's actions (and inaction) in order to decide whether Ridge Line has been deprived of a cognizable property interest.

## VI.

To summarize, in the present case, as noted above, the trial court did not address Ridge Line's inverse condemnation contention, and, therefore, did not evaluate whether the government's construction led predictably to Ridge Line's economic injury and was sufficiently substantial. On remand, it must do so. If the court concludes that consideration as a potential taking is proper, it must then address whether the steps taken by the government in storm water retention and the amount that nevertheless invaded South Hollow were reasonable under West Virginia law, including an assessment of the relative advantage to the Postal Service and disadvantage to Ridge Line in view of the increased storm water runoff and the relative social utility of the Postal Service facility. *See Page Motor,* 438 A.2d at 742 (noting that the reasonableness inquiry includes consideration of the utility of the use of the land relative to the resulting harm). The trial court found that storm water runoff into Ridge Line's property increased at least 70% due to the Postal Service development. However, it did not determine whether causing such an increase was reasonable, or weigh the other evidence bearing on reasonableness.

We thus vacate the trial court's judgment that no taking occurred. We hold that Ridge Line's property need not suffer an effectual destruction or a permanent and exclusive occupation by government runoff for a taking claim based on a flowage easement. However, whether there is a compensable taking in this case depends first on whether its loss may properly be analyzed under takings law as opposed to tort law, and then on whether Ridge Line has a protectable property interest under West Virginia property law that has been violated by government action.

In the event that the court determines on remand that Ridge Line has a protectable property interest and that the increased storm water flowage onto Ridge

Line's property constituted a taking of an easement in violation of that property interest, damages may be assessed based on Ridge Line's cost in constructing prudent flood control measures. *See Dickinson,* 331 U.S. at 751, 67 S.Ct. 1382 (upholding the trial court's award of damages based on the cost of protective measures for preventing erosion). A share of the costs of building and maintaining storm water control facilities, proportionate to the government's quantitative contributions of storm water volumes, erosion, and sedimentation, is an entirely acceptable method of calculating damages. Before the trial court, Ridge Line has provided substantial testimony, including that of LeRoy Rashid and Eduardo Vigil, regarding necessary storm control expenditures and the government's fair share of those expenditures. On remand, the trial court must make specific findings of facts relevant to liability, and if it is found, to damages, pursuant to Rule 52 of the Rules of the Court of Federal Claims.

▮ Alternatively, the court may determine damages based on the price the government has paid for flowage easements in comparable situations. Moreover, "just compensation" includes a recovery for "all damages, past, present and prospective." *Dickinson,* 152 F.2d at 867, *aff'd,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789. Thus, the damages analysis is not to be limited to 1993, the time of the alleged taking.

## CONCLUSION

For the reasons set forth above, we vacate the trial court's judgment for the government and remand for further analysis consistent with this opinion. On remand, the trial court need not reopen the record, unless necessary to address the issues raised above. Accordingly, the judgment of the trial court is

## VACATED AND REMANDED.

## COSTS

No costs.