# United States Court of Appeals for the Federal Circuit

---

**ARKANSAS GAME & FISH COMMISSION,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2009-5121, 2010-5029

---

Appeals from the United States Court of Federal Claims in case no. 05-CV-381, Judge Charles F. Lettow.

---

## ON PETITION FOR PANEL REHEARING AND REHEARING EN BANC

---

JULIE D. GREATHOUSE, Perkins & Trotter, PLLC, of Little Rock, Arkansas filed a petition for rehearing en banc for plaintiff-cross appellant. With her on the petition were JAMES F. GOODHART and JOHN P. MARKS, Arkansas Game & Fish Commission, of Little Rock, Arkansas.

ROBERT J. LUNDMAN, Attorney, Environment & Natural Resources Division, United States Department of Justice, of Washington, DC, filed a response for defendant-appellant. With him on the response was IGNACIA S. MORENO, Assistant Attorney General. Of counsel was SAMBHAV N. SANKAR, Attorney.

---

Before RADER, *Chief Judge*, NEWMAN, LOURIE, BRYSON, GAJARSA, LINN, DYK, PROST, MOORE, O'MALLEY, REYNA, *Circuit Judges*, and WHYTE[*], *District Judge*.

PER CURIAM.

DYK, *Circuit Judge*, with whom GAJARSA and LINN, *Circuit Judges*, join, concurs in the denial of the petition for rehearing en banc.

MOORE, *Circuit Judge*, with whom O'MALLEY and REYNA, *Circuit Judges*, join, dissents from the denial of the petition for rehearing en banc.

NEWMAN, *Circuit Judge*, dissents from the denial of the petition for rehearing en banc.


# O R D E R

A petition for rehearing en banc was filed by Plaintiff-Cross Appellant, and a response thereto was invited by the court and filed by Defendant-Appellant. The petition for rehearing was referred to the panel that heard the appeals, and thereafter the petition for rehearing en banc and the response were referred to the circuit judges who are authorized to request a poll of whether to rehear the appeals en banc. A poll was requested, taken, and failed.

Upon consideration thereof,

IT IS ORDERED THAT:

(1) The petition of Plaintiff-Cross Appellant for panel rehearing is denied.

(2) The petition of Plaintiff-Cross Appellant for rehearing en banc is denied.

---

[*]    Honorable Ronald M. Whyte, District Judge, United States District Court for the Northern District of California, sitting by designation, did not participate in the decision of whether to rehear the appeal en banc.

(3)  The mandate of the court will issue on August 18, 2011.

FOR THE COURT

August 11, 2011                    /s/ Jan Horbaly
Date                               Jan Horbaly
                                   Clerk

# United States Court of Appeals for the Federal Circuit

---

**ARKANSAS GAME & FISH COMMISSION,**

*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**

*Defendant-Appellant.*

---

2009-5121, 2010-5029

---

Appeal from the United States Court of Federal Claims in case no. 05-CV-381, Judge Charles F. Lettow.

---

DYK, *Circuit Judge*, with whom GAJARSA and LINN, *Circuit Judges*, join, concurring in the denial of the petition for rehearing en banc.

Contrary to the dissents' characterization, the approach here was compelled by existing law established by settled Supreme Court and circuit precedent.

The Supreme Court has long required that we "distinguish[ ] between torts and takings." *See Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003) (citing *Barnes v. United States*, 538 F.2d 865, 870 (Ct. Cl. 1976)). A taking, involving a "permanent condition of continual overflow" or a "permanent liability to intermittent but inevitably recurring overflows," *United States v. Cress*, 243 U.S. 316, 328 (1917), is distinct from a tort—

an "injury [that] was in its nature indirect and consequential," *Sanguinetti v. United States*, 264 U.S. 146, 150 (1924).

In drawing this line, the "[Supreme] Court has consistently distinguished between flooding cases involving a permanent physical occupation . . . and cases involving a more temporary invasion." *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 428 (1982). "A taking has always been found only in the former situation." *Id.* Indeed, flooding only amounts to a taking when it "constitute[s] an actual, permanent invasion of the land, amounting to an appropriation of and not merely an injury to the property." *Sanguinetti*, 264 U.S. at 149.

Flooding constitutes this type of permanent invasion when there is a "permanent condition of continual overflow" or "a permanent liability to intermittent but inevitably recurring overflows." *Cress*, 243 U.S. at 328; *see also United States v. Kansas City Life Ins. Co.*, 339 U.S. 799, 809 n.8 (1950) (same). The Court in *Cress* expressly distinguished the "inevitably recurring" flooding in that case, which was caused by the erection of a lock and dam, from "a case of temporary flooding or consequential injury." 243 U.S. at 327. Moreover, our predecessor court consistently recognized that flooding must be inevitably recurring to constitute a taking. The Court of Claims has held that "[t]he plaintiff must establish that flooding will 'inevitably recur,' in the phrasing of the *Cress* case." *Nat'l By-Prods., Inc. v. United States*, 405 F.2d 1256, 1273, 1274 (Ct. Cl. 1969) (finding that plaintiff did not prove a taking because it "failed to establish that the floodings . . . will inevitably recur"). Therefore, the Court of Claims has rejected takings claims when flooding was caused by a "temporary situation" which would not lead to the "inevitably recurring floodings which the Supreme Court stressed . . . in the *Cress* case." *Fromme v. United States*,

412 F.2d 1192, 1196–97 (Ct. Cl. 1969). "Government-induced flooding not proved to be inevitably recurring occupies the category of mere consequential injury, or tort." *Ridge Line*, 346 F.3d at 1355 (quoting *Barnes*, 538 F.2d at 870).

The Court of Claims' decision in *Barnes* clearly illustrates this long-governing rule. In *Barnes*, the government released water from a dam starting in 1969, which caused flooding on plaintiffs' properties from 1969–1973 and again in 1975. 538 F.2d at 868–69. The government stipulated that the releases which caused the flooding would continue. *Id.* at 870. Based on the premise that the intermittent flooding would "continue indefinitely," the court found that the flooding was a taking because it "will be inevitably recurring." *Id.* at 870, 872. However, it held that the flooding could not constitute a taking until "the permanent character of [the] intermittent flooding could fairly be perceived," and it therefore denied recovery for crop damage sustained before 1973, which was when it could "be said with relative certainty that the flooding would be permanent." *Id.* at 873.

Here it was anything but "inevitable" that the government would continue the temporary policies that caused the flooding. The United States Army Corps of Engineers ("Corps") made a series of ad hoc and independent decisions to deviate from the normal release rates at a dam in Missouri, which sometimes caused intermittent flooding on the plaintiff's property. The Corps' decisions about whether or not to deviate were made on a yearly basis. The Corps attempted to bring interested parties together to formulate a new release plan for the dam; however, the groups responsible were unable to agree on a long-term solution. *Ark. Game & Fish Comm'n v. United States*, 637 F.3d 1366, 1369–70 (Fed. Cir. 2011). As a result, multiple interim plans were

adopted. *Id.* These multiple interim deviation plans were viewed by everyone involved, including the plaintiff, as "interim operating plan[s]." *Id.* at 1369–70, 1377–78.

Each interim plan differed from the next, as the Corps and interested parties tried different ideas and attempted to come to an agreement. *See id.* at 1369–71. Once the interested parties proposed a final plan, the Corps abandoned the concept of adopting a permanent deviation plan, returned to normal regulation, and never adopted a permanent change to the normal release rates. *Id.* at 1371. Under these circumstances, it could never "be said with relative certainty," *Barnes*, 538 F.2d at 873, that the deviations (and hence the flooding) would even occur the following year. It certainly could not be said that the flooding would inevitably recur.

Contrary to the dissents, the panel majority did not create a blanket rule under which any flood-causing policy that is labeled temporary by the government will allow the United States to avoid takings liability. A policy that in its inception is designed to be permanent but which is later terminated could lead to liability, just as liability could exist if a permanent condition were created and the land were later reclaimed. *See United States v. Dickinson*, 331 U.S. 745, 746–47, 751 (1947). The panel majority specifically held that "in other contexts the distinction between a temporary and permanent release plan may be difficult to define," and "[t]he government cannot . . . avoid takings liability by characterizing inevitably recurring events as merely a series of temporary decisions." *Ark. Game & Fish Comm'n*, 637 F.3d at 1379. If the government, with the objective of creating a permanent or recurring condition had pursued that goal by adopting fifty consecutive and identical one year deviations (Judge Moore's hypothetical), such action might properly be viewed as permanent or "inevitably recurring." Here, we

have no such scenario. The temporary nature of the policies is more than simply a label placed on the policies by the government. Rather, it is clear that this was a situation in which there was genuine uncertainty about the nature of the policies from year to year as the Corps responded to individualized concerns and individualized circumstances over (in the aggregate) a short period of time. The government's actions and the surrounding context demonstrate that the policies were temporary and not inevitably recurring.

Therefore, given that settled Supreme Court and circuit precedent dictated the result, I concur in the court's refusal to rehear this case en banc.

# United States Court of Appeals for the Federal Circuit

---

**ARKANSAS GAME & FISH COMMISSION,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2009-5121, 2010-5029

---

Appeals from the United States Court of Federal Claims in case no. 05-CV-381, Judge Charles F. Lettow.

---

MOORE, *Circuit Judge*, with whom, O'MALLEY and REYNA, *Circuit Judges*, join, dissenting from the denial of the petition for rehearing en banc.

This Circuit is uniquely responsible under the Tucker Act for Fifth Amendment Takings claims. The majority's misapplication of Supreme Court Takings jurisprudence creates a bar to relief in cases involving flooding caused by Government action, cases in which established doctrine would otherwise provide Constitutional protection to private property. I respectfully dissent.

The majority in this case precludes the possibility of a takings claim due to flooding caused by "temporary" government action regardless of the duration or severity of the condition. The majority holds that the only poten-

tial remedy is in tort. I disagree. An early Supreme Court decision, *United States v. Cress*, 243 U.S. 316, 328 (1916), handed down well before the development of the concept of 'temporary takings' as it is understood today, talked in terms of requiring that for flooding to constitute a taking, it must be "inevitably recurring." But that does not preclude the possibility that a government action labeled "temporary" could give rise to such "inevitably recurring" flooding. To allow the government's "temporary" label for the release rate deviations to control the disposition of this case elevates form over substance and leads to untenable results with enormous future consequences.

The key distinction today is whether the flooding at issue is a one time or incidental event, in which case the consequent injury is characterized as a tort, or whether the injury, substantial over time, is a continuing or recurring one and the predictable consequence of the Government's conduct. In the latter case, it is a taking. As we have explained: "The tort-taking inquiry in turn requires consideration of whether the effects . . . experienced were the predictable result of the government's action, and whether the government's actions were sufficiently substantial to justify a takings remedy." *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003).

The facts of this case are quite simple. Due to government action that caused eight years of intermittent flooding, the Arkansas Game and Fish Commission (Commission) lost more than $5 million worth of timber. The Court of Federal Claims found that the effects of the flooding were predictable and that the government's actions were sufficiently substantial to justify a takings remedy. *Ark. Game & Fish Comm'n v. United States*, 87 Fed. Cl. 594, 623 (2009). There is no error in this decision.

Reversing the trial court's decision, the majority begins its analysis with an acknowledgement of current doctrine: "If particular government action would constitute a taking when permanently continued, temporary action of the same nature may lead to a temporary takings claim." *Ark. Game & Fish Comm'n v. United States*, 637 F.3d 1366, 1374 (Fed. Cir. 2011) (citing *First English Evangelical Lutheran Church of Glendale v. County Of Los Angeles*, 482 U.S. 304, 328 (1987)). The majority goes on, however, to reject current doctrine as inapplicable to flooding cases. *Ark. Game*, 637 F.3d at 1374-75. The majority states that, unlike other types of takings, flooding due to government action must constitute a "permanent invasion" in order for the landowner to recover. *Id.*

I do not agree. The distinction is between torts and takings. This does not correlate, as the majority holds, to temporary and permanent. In short, I do not believe that every "temporary" action by the government which causes recurring flooding is compensable only under a tort theory. The majority tells us that to constitute a taking, rather than a tort, there must be substantial damage from "inevitably recurring" flooding. But, under the majority's rule, there can never be "inevitably recurring" flooding if the government action is *temporary*.

The majority holds that eight years of release rate deviations resulting in repeated annual overflow flooding (certainly recurring), cannot ever be a taking because each release rate deviation was an individual event with its own start and end date – they were each temporary. *Ark. Game*, 637 F.3d at 1369 (the release rate deviations were "only for limited periods of time" and "therefore the approved deviations were by their nature temporary."). Therefore, according to the majority, these release rate deviations do not give rise to the sort of "permanent invasion" required for a taking.

I do not agree. As an initial matter, it is clear that government action which results in only a temporary flooding can be a compensable taking. In *United States v. Dickinson*, 331 U.S. 745, 746-47 (1947), the government constructed a dam that led to persistent flooding on the plaintiffs' lands. *Id.* "At considerable expense . . . [plaintiff] reclaimed most of his land which the Government originally took by flooding." *Id.* at 751. Although the landowner reclaimed the land, the Supreme Court nevertheless held that the taking was compensable. *Id.* Hence, something less than permanent flooding can constitute a compensable taking. The majority agrees that there would have been a compensable taking if the release rate deviations that were passed were permanent, even if they were rescinded years later so that the Commission could reclaim its land.

With all due respect, there is no meaningful difference between that set of facts and this one. The government recognizes this incongruity. Gov't Resp. to Pet. For Reh. at 7 ("[I]f the Corps had approved a permanent deviation plan and then reversed course ten years later, the situation would at least be much closer to a permanent change constituting a taking."). As we earlier made clear:

> [T]he government when it has taken property by physical invasion could subsequently decide to return the property to its owner, or otherwise release its interest in the property. Yet no one would argue that that would somehow absolve the government of its liability . . . All takings are 'temporary' in the sense that the government can always change its mind at another time.

*Hendler v. United States*, 952 F.2d 1364, 1376 (Fed. Cir. 1991). If a flowage easement which is terminated after eight years can be a compensable taking, why can't an

eight year flowage easement or eight consecutive one year flowage easements?

Under the majority's rule, even if the government enacted 50 consecutive one year release rate deviations – such that the flooding had inevitably recurred for 50 years – these would still be temporary and no taking could be found. The Supreme Court has held that "it is the character of the invasion . . . that determines the question of whether it is a taking." *Cress*, 243 U.S. at 328. The fact finder must be able to, with the benefit of hindsight, determine the character of an invasion and find that the result is flooding that is "inevitably recurring." The author of the majority in this case agrees that 50 one-year deviations could amount to a taking because of their character of permanence. Concurrence at 4. With all due respect, the question of whether eight years of deviations are similarly adequate is best left to the fact finder – the Court of Federal Claims. I cannot hinge the entire takings analysis, as the majority does, on the government's chosen label for the action – temporary or permanent.

The distinction between tort and takings in the flooding cases is not as easy as saying one flood is a tort and any more than that a taking. Nor is it as simple as the majority would have it – if the government action turns out to have had a limited duration it cannot be a taking. As our predecessor court explained:

> The Government has been liable where the construction of a dam or other obstruction in a stream results in either permanent flooding or a 'permanent liability to intermittent but inevitably recurring overflows.' But the courts have held that one or two or three floodings by themselves do not constitute a taking. The plaintiff must es-

tablish that flooding will 'inevitably recur', in the phrasing of the Cress case.

The distinction between 'permanent liability to intermittent but inevitably recurring overflows,' and occasional floods induced by governmental projects, which we have held not to be takings is, of course, not a clear and definite guideline.

*Nat'l By-Products, Inc. v. United States*, 405 F.2d 1256, 1273, 74 (Ct. Cl. 1969) (citations omitted). Here there were eight years of inevitably recurring flooding caused by governmental action which has now been brought to an end. I think the Court of Federal Claims properly analyzed the eight years of release rate deviations and the recurring flooding that these caused and determined that the character of this government action – this repeated, consistent flooding – constituted a taking.

Determining whether the government action in question is a tort or a taking requires a flexible case-by-case approach considering the character of the government action as a whole, the nature and extent of the flooding that was caused and the resultant damage that occurred. The Court of Federal Claims did just that. By contrast, the majority adopted a rigid, unworkable and inappropriate black letter rule – if the government action which causes flooding and substantial damage to a property holder is of limited duration it can never be a taking.

Because we miss the opportunity to correct this error of law, I respectfully dissent from the denial of en banc.

# United States Court of Appeals
# for the Federal Circuit

---

**ARKANSAS GAME & FISH COMMISSION,**
*Plaintiff-Cross Appellant,*

**v.**

**UNITED STATES,**
*Defendant-Appellant.*

---

2009-5121, 2010-5029

---

Appeals from the United States Court of Federal Claims in case no. 05-CV-381, Judge Charles F. Lettow.

---

NEWMAN, *Circuit Judge*, dissenting from denial of rehearing en banc.

I respectfully dissent from the denial of the Commission's petitions for rehearing and for rehearing en banc. As discussed with respect to the panel majority's decision, Fifth Amendment principles as explicated and applied by the Supreme Court, by the Federal Circuit and the Court of Claims, and here by the Court of Federal Claims, negate the reasoning and the result of the panel majority. *See Arkansas Game & Fish Commission v. United States*, 637 F.3d 1366, 1379 (Fed. Cir. 2011) (Newman, J., dissenting).

The Corps of Engineers ultimately agreed that its unilateral and protested flooding of the Arkansas Manage-

ment Area was injurious, and because of this injury the Corps terminated its departure from the previously agreed release schedule of water from the Clearwater Dam. It was found at trial, and not disputed in this court's majority decision, that this flooding caused permanent injury and destruction of Management Area timber, destruction that was not reversible after the Corps finally ended its deviations. The panel majority's holding that this injury is not compensable, on the theory that injury caused by temporary floodings is *per se* never eligible for consideration as a "taking," is contrary to law and precedent, as reiterated in the accompanying dissent from denial of rehearing en banc.

Even the government is uncomfortable with the court's new rule, for in its brief responding to the Commission's petition, the government disingenuously announces that "the panel majority did not establish a *per se* rule." Gov't Response at 1. However, the panel majority did indeed establish a *per se* rule, stating that "because the deviations from the 1953 plan were only temporary, they *cannot* constitute a taking." *Arkansas Game & Fish Commission*, 637 F.3d at 1378-79. The panel majority also creates the new rule that it is not necessary to apply the balancing test elaborated in *Ridge Line, Inc. v. United States*, 346 F.3d 1346, 1355 (Fed. Cir. 2003), stating that "we need not decide whether the flooding on the Management Area was 'sufficiently substantial to justify a takings remedy' or 'the predictable result of the government's action' [quoting from *Ridge Line*] because the deviations were by their very nature temporary." 637 F.3d at 1376. This position is in conflict with Supreme Court precedent, as summarized in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 436 n.12 (1982): "As . . . the intermittent flooding cases reveal, such temporary limitations are subject to a more complex balancing process to

determine whether they are a taking."  See, for example, this court's treatment of analogous facts in *Cooper v. United States*, 827 F.2d 762 (Fed. Cir. 1987), where six years of intermittent flooding were caused by a Corps of Engineers construction project that clogged the river while the construction proceeded, and was held to be a "taking" of the destroyed timber, although the construction project and its effect on the river were always understood not to be permanent.

A judge of the majority opinion now proposes that "the panel majority did not create a blanket rule."  (Dyk, J. concurring in the denial of rehearing en banc, at 4). However, a single judge cannot rewrite the words and change the ruling of the court's issued opinion.  If anything, such an attempted qualification adds confusion, not clarity, to this precedential decision.

On its face, the court's ruling conflicts with extensive precedent, as well as strains constitutional principles. From the denials of rehearing and of rehearing en banc, I respectfully dissent.