*Krull v. Town of Huntington*, No. 651-7-15 Cncv (Mello, J., Dec. 22, 2017).

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

VERMONT SUPERIOR COURT
CHITTENDEN UNIT
CIVIL DIVISION

| | |
|---|---|
| JEFFREY KRULL,<br>  Plaintiff<br><br>  v.<br><br>TOWN OF HUNTINGTON and<br>JOHN SCOTT EXCAVATING, INC.,<br>  Defendants | Docket No. 651-7-15 Cncv |

RULING ON PENDING MOTIONS

Plaintiff Jeffrey Krull brings this action for negligence and trespass against the Town of Huntington and John Scott Excavating, Inc., following flooding events in 2011 and 2013 that resulted in substantial damage to his property. In essence, he alleges that Defendants negligently performed maintenance and repair work on a nearby road, and that Defendants' negligence and trespass caused the property damage. Now before the court are numerous pending motions. The court heard oral argument on September 11, 2011. Jacob O. Durell, Esq. represents Plaintiff Krull. James F. Carroll, Esq. represents Defendant Town of Huntington. Gregory A. Weimer, Esq. represents Defendant John Scott Excavating, Inc.

Since the summer, Defendants have raised concerns about serial, late filings by Plaintiff, while Plaintiff has continually sought to supplement his filings, sometimes even months after the applicable deadlines. Thus, preliminarily, the court clarifies that in ruling on the pending motions, it has considered materials filed up until September 15, 2017, as stated at the September 11th oral argument, but has not considered materials filed after that date.

DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

The Town of Huntington moves for summary judgment on the grounds that it is entitled to municipal sovereign immunity, and alternatively that the negligence and trespass claims both fail on the merits. Huntington also asserts that, to the extent the complaint alleges a conversion, that claim also fails on the merits. John Scott Excavating ("JSE") similarly moves for summary judgment on the grounds that, as a government contractor, it is entitled to the Town's immunity, and also that the tort claims fail on the merits. Furthermore, both Defendants move for summary judgment on certain categories of damages. They contend that Plaintiff cannot recover punitive damages and emotional distress damages in this case.

Facts

The following facts are undisputed for purposes of the motions for summary judgment, unless otherwise noted. In October 2008, Plaintiff purchased real property located at 310 Economou Road in Huntington, Vermont. The property is roughly 21 acres and includes a 600

square foot house. The property is on the western side of Economou Road, and the house is located on a small, flat spot of land, surrounded by steep hillsides to the south, west, and east. A creek or stream traverses the property and runs within a few feet to the west of the residence, but does not cross Economou Road in the vicinity of the property. Surface water from the steep slope to the west runs into the creek before reaching Plaintiff's house. Surface water from the east and south is intended to be managed by a series of culverts and ditches to run into the creek without negatively impacting the residences along Economou Road, including Plaintiff's residence.

Economou Road is steep and narrow, in excess of 10 percent grade in some locations. Immediately to the south of Plaintiff's property, the road becomes steep and increases rapidly with elevation, with a sharp curve in the road. The land is also very steep and increases rapidly in elevation across Economou Road from Plaintiff's property to the east. This land is forested and undeveloped, with up to a 25 percent slope. As a result of the steep terrain sloping downwards to the flat spot where Krull's house sits, the probable area draining to the property is about 20 acres. Krull's expert, Blair Enman, P.E., observes that "[t]his is a significant drainage area capable of producing substantial runoff."

In late April 2011, a severe rainstorm hit Economou Road and the surrounding area. The creek did not overflow, but surface water from the surrounding area washed across the property, bringing with it rocks, rubble, gravel, and silt strewn across the entire house site. Parts of the road were washed out, including a large trench on the east side of the road near Krull's property. Economou Road sustained significant damage both in the immediate vicinity of the property, and in a separate stretch further to the south. Following this rainstorm, Huntington hired John Scott Excavating ("JSE") to repair the road, which consisted of digging out an existing ditch along the eastern side of the road and lining it with "rip rap," digging up an existing culvert and shaking it out to clear it of sediment and replacing it in the same location, and delivering gravel that the Town used to repair and grade the road. When JSE's work was complete, the Town reviewed and approved it. Prior to the April 2011 storm, JSE did not perform any work for the Town on Economou Road related to the location or sizing of culverts or drainage ditches, or the design of the road.

At the time of the 2011 storm, Krull was in the process of substantially renovating his property. For that reason, he was not living there during that time, and was not on the property the day of the storm. As part of the renovations, he had removed some walls and siding from the house to open up access to the crawl space underneath. This space was open to the elements during the 2011 storm, and became flooded with water, rocks, and sediment. Krull returned to his property after the storm was over and took photographs. He did not observe the storm event as it progressed. A large amount of winter storm debris on the slope to the east of Economou Road was swept up in the April 2011 storm and caused the culverts to become unusually clogged with material.[1]

On July 3, 2013, a severe storm again hit Economou Road and the surrounding area. An extremely large volume of rapidly moving water swept through Economou Road and significantly

---

[1] Plaintiff purports to dispute this, claiming that minutes for a June 27, 2017 Selectboard meeting indicate that fall maintenance was not done prior to snowfall, and that this was the cause of excess debris in the system. Plaintiff fails to indicate where these meeting minutes are in the record. *See* V.R.C.P. 56(c)(1)(A) (party asserting that a fact is genuinely disputed must file separate statement of disputed facts "with specific citations to particular parts of materials in the record"); Webb v. Leclair, 2007 VT 65, ¶¶ 4–6, 182 Vt. 559 (Rule 56(c) is meant to avoid such "needle in a haystack" searches). The court accepts Huntington's proffered fact as undisputed.

damaged the road. The creek on Krull's land did not overflow, but surface water from the surrounding area again flooded through the property, bringing with it rocks, gravel, and sediment. Unlike during the April 2011 storm, Krull was at the property during the July 2013 storm. Krull states he was never in danger of physical injury during the 2013 storm.

During the 2013 storm, the Huntington road foreman Clinton "Yogi" Alger was handling road troubles throughout the town. At some point during the storm, he went to Economou Road and saw that water was overrunning the culverts and ditches, and flooding across the road. Because Alger needed to address numerous issues throughout the town, he called John Scott of JSE for emergency assistance in addressing the flooding on Economou Road. Alger and Scott met at the base of Economou Road near Texas Hill Circle, and Alger requested that JSE clear a culvert at the intersection of Texas Hill and Economou, and then clear the ditches and culverts on Economou Road. Yogi then left to address other roads in town, and did not see or talk to Scott while JSE was working on Economou Road.[2]

In an attempt to divert the water from Krull's property and his home, JSE began clearing out the drainage ditch on the east side of the road. Water continued to rush over the road and toward the property. According to JSE, it attempted to divert this flow pattern by creating a "berm" across the road to direct the water toward a stream that runs behind Krull's house, in hopes of preventing it from continuing to reach his house. JSE used a bucket loader to dig out a pathway for the water to follow on Krull's side of the road as part of this effort. During this process, JSE asserts, it reached over the bank on to Krull's property with the excavator. Then, JSE continued to attempt to clear the ditch on the east side of the road. Despite JSE's efforts, water continued to flow across the road toward Krull's property at roughly the same intensity until the storm wound down. As discussed below, Krull disputes this account of JSE's actions. He contends that JSE went more than 60 feet onto his property. He also contends that JSE unnecessarily dug a ditch that resulted in the destruction of trees and vegetation, increased flow of water and road material to his house, and plainly would not have diverted the flow to the natural stream.

Plaintiff's property incurred extensive damage following the 2011 and the 2013 rainstorms. To this day, a significant amount of rocks, gravel, and sediment still covers parts of his property. As a result, he has been unable to make full use of his property, has incurred additional expenses for alternative living arrangements, and has had difficulty financing potential projects on his land. Plaintiff brought this action on July 6, 2015.

Discussion

I.      Town of Huntington's Municipal Immunity

The doctrine of municipal sovereign immunity "protects municipalities from tort liability in cases where the municipality fulfills a governmental rather than a proprietary function." Graham v. Town of Duxbury, 173 Vt. 498, 499 (2001).[3] Activities such as "[b]uilding and maintaining

---

[2] While JSE frequently does work for Huntington, Scott is not a town employee. Alger also delegated work to several other contractors to assist with other parts of Huntington during the 2013 storm.

[3] The following A.L.R. comment summarizes the general principles underlying the municipal immunity doctrine:

> (1) the supposed immunity of the sovereign from suit, which is extended to the municipality as the representative or agency of the sovereign, (2) the idea that it is more expedient that scattered individuals suffer than that the public in general be inconvenienced, and (3) the considerations of public policy involved in the theory

streets, and the accompanying drainage system, are generally government functions, and no liability for injuries suffered as a result of such activities may attach." Id.; *see also* Dugan v. City of Burlington, 135 Vt. 303, 304 (1977) (street); Sanborn v. Village of Enosburg Falls, 87 Vt. 479, 482 (1914) (drainage system for street); O'Connor v. City of Rutland, 172 Vt. 570, 570–71 (2001) (assuming that city was negligent in failing to maintain adequate crosswalks and street lighting in case where plaintiff's daughter was struck and killed by motorist while crossing street, city was immune from suit because those were governmental functions). Defendants' acts alleged here plainly fall into this category of maintenance of streets and the accompanying stormwater drainage system, and therefore constitute governmental functions protected from tort liability under municipal sovereign immunity.

The court recognizes that the application of municipal immunity may lead to a harsh result, particularly in cases where the municipality would otherwise be liable for tortious conduct, and where the plaintiff would be left with no remedy for the damages he or she sustained resulting from the municipality's actions. The Vermont Supreme Court has recognized the "harsh results" and "arbitrariness" of general municipal immunity and its "governmental/ proprietary" distinction, and has observed that "Vermont is one of a minority of states that retains the governmental-proprietary distinction, which has been criticized by courts and commentators for many years as unworkable." Hudson v. Town of E. Montpelier, 161 Vt. 168, 178 n.3 (1993).[4] Indeed, Justice Johnson wrote that she "would abolish general municipal immunity along with the governmental/proprietary distinction" and adopt Restatement (Second) of Torts § 895C (1979). Hillerby v. Town of Colchester, 167 Vt. 270, 282, 291 (1997) (Johnson, J., dissenting). In that same case, in a separate dissent, Justice Dooley agreed with Justice Johnson that the governmental/proprietary distinction was inappropriate and should be abandoned. Id. at 276 (Dooley, J., dissenting).

Yet, a majority of the Supreme Court declined to take action:

> Our refusal to abolish the governmental/proprietary distinction should not be read as an endorsement of that distinction. We point out, as we did in Hudson, 161 Vt. at 177-78 n. 3, that many courts, legislatures, and commentators have strongly criticized this method of determining municipal liability. Yet we believe that our role in addressing this issue, at this time, is not to reform the rules of municipal immunity, but to give the Legislature the initial opportunity

---

that governmental agents will perform their duties more effectively if not hampered by fear of tort liability.

Comment Note, Municipal Immunity from Liability for Torts, 60 A.L.R.2d 1198, § 2 (originally published in 1958).

[4] The Restatement aptly summarizes this history of criticism:

> The immunity of local governments has long been under attack, and the justifications that have been offered for it have been condemned as unsound. All of them can be found to have been rejected at one time or another in the decided cases. The current of criticism has been that it is better that the losses due to the tortious conduct of officers and employees should fall upon the municipality rather than upon the injured person and that the torts of public employees are properly to be regarded, as in other cases of vicarious liability, as a cost of the administration of government and should be borne by the public.

Restatement (Second) of Torts § 895C cmt. (d) (1979).

4

to fashion a more reasonable and workable doctrine. Its fact-finding and problem-solving process is better suited for the task in this area of the law.

Hillerby, 167 Vt. at 276; *see also* O'Connor, 172 Vt. at 570–71 (declining to overturn Hillerby in 2001 when it was still "recent precedent," and noting that the "considerations that underlie Hillerby also weigh against overturning it"). Thus, the Court suggested a willingness to revisit the issue if the legislature declines to fashion "a more reasonable and workable doctrine." Perhaps, given that the Legislature has now had an "initial opportunity" to rework the municipal immunity doctrine and that it has apparently not done so in the 20 years after Hillerby, the Court might now be inclined to reform the doctrine on its own. However, in light of the Court's relatively recent refusal to abrogate the doctrine despite full knowledge of the doctrine's criticisms and potential for harsh results, this court does not see how it can do so now.

Plaintiff contends that the immunity doctrine does not apply here because this case involves a "sewer." It is true that an exception to municipal immunity exists with respect to maintenance of sewers, which is considered to be a proprietary function. *See* Dugan v. City of Burlington, 135 Vt. 303, 304–05 (1977) ("The building and maintenance of streets and sidewalks are governmental functions, while the maintenance of sewers is considered proprietary.") (citations omitted); Sanborn v. Vill. of Enosburg Falls, 87 Vt. 479, 482 (1914). But the material facts in this case do not relate to a sewer. The allegation is that Defendants negligently maintained or repaired a road and its accompanying stormwater drainage system, which was not connected to any sewer system. *See* Graham v. Town of Duxbury, 173 Vt. 498, 499 (2001) (building and maintaining a street's "accompanying drainage system" is a governmental function); Sanborn v. Vill. of Enosburg Falls, 87 Vt. 479, 482 (1914) ("it is clear from the case that the sluice, catch-basin, and tile in question were not sewers *and were no part of any sewer system*") (emphasis added). Nor does a sewer system exist anywhere in Huntington. There is absolutely no evidence that the street drainage system at issue here is a "sewer."

Another limited exception to municipal immunity involves natural streams. *See* Graham v. Town of Duxbury, 173 Vt. 498, 500 (2001) ("a town may be liable for subsequent damage to surrounding property after receiving notice of a problem concerning a natural stream") (citing Sargent v. Town of Cornwall, 130 Vt. 323, 328 (1972); Haynes v. Town of Burlington, 38 Vt. 350, 362 (1865)). Like the sewer exception, the natural stream exception is also inapplicable here. A natural stream does cross into Plaintiff's property to the west of his house, but there is no allegation or evidence that the stream overflowed or otherwise damaged Plaintiff's property as a result of any actions taken by Defendants.

Although a municipality waives sovereign immunity by purchasing liability insurance, 29 V.S.A. § 1403, the Supreme Court has explicitly held that "[s]uch waiver does not occur when insurance or reinsurance is acquired through participation in an intermunicipal insurance agreement such as VLCT PACIF."[5] McMurphy v. State, 171 Vt. 9, 15–16 (2000) (citing 24 V.S.A. §§ 4942, 4946). Huntington has submitted evidence that it did not purchase its own liability insurance coverage at any time related to the subject flooding events, and instead was a member

---

[5] VLCT PACIF refers to the Property and Casualty Intermunicipal Fund (PACIF), which is managed by the Vermont League of Cities and Towns (VLCT). *See* McMurphy v. State, 171 Vt. 9, 15 (2000).

of PACIF. This fact is undisputed.[6] Huntington did not waive its municipal sovereign immunity by purchasing liability insurance.

Because the Town is entitled to municipal immunity, the court need not consider the arguments regarding Plaintiff's negligence and trespass claims against the Town. For the sake of completeness, however, the court notes briefly in dicta that the record appears to lack genuinely disputed material facts indicating that the Town was negligent. Plaintiff's theory of negligence is that the Town breached a duty of care by not performing a hydraulic analysis for any of the culverts or ditches on Economou Road, in violation of the town Road Standards and the VTrans Hydraulics Manual, and that at least one of the culverts was too small (15 inches instead of the required 18 inches) in violation of a VTrans highway standard. A hydraulic analysis, he argues, would demonstrate that insufficient culvert and ditch capacity exists to meet the regulatory standard of care for preventing runoff from a once-in-25-year rainstorm. Aside from the fact that Plaintiff's expert has not undertaken a hydraulic analysis (and has requested that the Town pay for one), the evidence undisputedly shows that a hydraulic design was not required for any of the culverts or ditches on Economou Road, and that the Town therefore could not have breached the cited Road Standards or Hydraulics Manual by not performing such an analysis. Furthermore, the culvert that Plaintiff contends is too small because it is 15 inches is, in fact, undisputedly 18 inches. Moreover, it is far from clear that there was even an actionable duty, as generally there is no private right of action for failure to comply with a municipal standard. *See generally* Corbin v. Buchanan, 163 Vt. 141 (1994).

Plaintiff further contends that municipal immunity does not apply because he has asserted a state law "takings" claim. That argument is addressed below with respect to the motion to amend his complaint. To the extent Plaintiff asserts that there is evidence of gross negligence or recklessness, and that this evidence provides another exception to the application of the municipal immunity doctrine, the court finds no such admissible evidence in the summary judgment record. "[G]ross negligence is 'more than an error of judgment, momentary inattention, or loss of presence of mind'; rather, 'it amounts to a failure to exercise even a slight degree of care' and an 'indifference to the duty owed [to another].'" Hardingham v. United Counseling Serv. of Bennington Cty., Inc., 164 Vt. 478, 481 (1995) (quoting Rivard v. Roy, 124 Vt. 32, 35 (1963)); *see also* Shaw v. Moore, 104 Vt. 529 (1932) ("Gross negligence is substantially and appreciably higher in magnitude and more culpable than ordinary negligence. [It] is equivalent to the failure to exercise even a slight degree of care."). Plaintiff has offered no admissible evidence of ordinary negligence by the Town, let alone gross negligence or recklessness.

## II.     Government Contractor Immunity

The court must also consider whether the Town's immunity extends to its contractor, John Scott Excavating, which the Town hired to perform road and culvert repairs on Economou Road. While the Vermont Supreme has apparently not addressed this issue, other courts have extended governmental immunity to private entities who carry out governmental directives. The general rule with respect to extending governmental immunity to private contractors has been described as follows:

---

[6] Plaintiff purports to dispute this fact only by asserting that "PACIF may constitute insurance." Under clearly established law, PACIF does not constitute insurance for purposes of waiving municipal immunity. *See* McMurphy, 171 Vt. at 15–16; 24 V.S.A. § 4946.

> [W]here the act, or failure to act, which causes an injury is one which the contractor was employed to do, and the injury results not from the negligent manner of doing the work, but from the performance thereof or failure to perform it at all, the contractor is entitled to share the immunity from liability which the public enjoys, but that the contractor is not entitled to the immunity of the public body from liability where the injury arises from the tortious manner of performing the work.
>
> Thus, the courts are practically unanimous in holding a public contractor liable for his negligence, or his wilful torts, and in holding him not liable for necessary or incidental damages.

Annot., Right of Contractor with Federal, State, or Local Public Body to Latter's Immunity to Tort Liability, 9 A.L.R.3d 382, § 2(a) (originally published in 1966) (collecting cases). The New Jersey Supreme Court has observed two principles underlying the extension of municipal immunity to governmental contractors: (1) that "the immunity of the entity itself would become meaningless if contractors complying with its design were liable in tort for defects in that design"; and (2) that it would be "fundamentally unfair to hold a contractor liable" for injury caused by defective plans, where that contractor was bound to "specifications that are provided by a public entity and over which it has no control" in the absence of a "blatant, obvious danger that the contractor should have brought to the attention of the public entity." Vanchieri v. New Jersey Sports & Exposition Auth., 514 A.2d 1323, 1326 (N.J. 1986).

Under this general rule, then, JSE would be liable for its own negligence or intentional torts that resulted in injury, but would be entitled to share in the Town's immunity for "incidental injuries necessarily involved in the performance of the contract" not resulting from its own negligence or other tortious conduct, or ultrahazardous methods. Id. § 3; *see also*, *e.g.*, Boyle v. United Techs. Corp., 487 U.S. 500, 512–13 (1988) (adopting a "government contractor defense" and holding that it could bar the estate of a military helicopter pilot from suing the manufacturer for alleged design flaws if the challenged design choice was made by military officials); Estate of Lyons v. CNA Ins. Companies, 558 N.W.2d 658, 663 (Wis. Ct. App. 1996) (adopting "a form of governmental contractor immunity applicable to parties who contract with municipal or state authorities and are directed to perform certain tasks under that contract" and holding that bridge designer was entitled to immunity); Vanchieri v. New Jersey Sports & Exposition Auth., 514 A.2d 1323, 1326 (N.J. 1986) ("When a public entity provides plans and specifications to an independent contractor, the public contractor will not be held liable for work performed in accordance with those plans and specifications."). JSE would also be entitled to share in the Town's municipal immunity if Plaintiff's damages resulted from some design flaw in the roads or culverts, and if JSE had merely followed specifications given by the Town. Because tortious conduct by JSE in the performance of its work would not be immune, the court must examine the merits of the negligence and trespass claims asserted against JSE.

### III.     Negligence of John Scott Excavating

There is no evidence of negligence by JSE in performing its contracted tasks in response to the 2011 rainstorm. As to the 2013 storm, Plaintiff's own expert, Blair Enman, says nothing

remotely critical of JSE in his report, affidavit, or deposition.[7] However, Plaintiff offers some evidence of negligence by JSE in his own affidavit, in the form of eyewitness testimony.[8]

Plaintiff's version of the events of July 3, 2013, as recounted in his affidavit, differs from the account offered by John Scott Excavating. JSE contends that it merely reached over onto Plaintiff's property with its excavator, while Plaintiff asserts that he saw JSE go at least 60 feet onto his property. JSE also contends that it attempted to redirect the flow of water to a natural stream that runs behind Plaintiff's house by creating a berm across the road and digging a ditch on Plaintiff's side of the road. Plaintiff, however, asserts that this action was negligent, as detailed in his affidavit:

> The excavator had . . . dug a ditch across the road focusing all of the runoff from approximately .5 miles of road uphill on the east side of the road directly to the "South Site" [part of Plaintiff's property]. This diverted most of the water, rock, and debris from . . . across the road and began flooding water over the [neighbors'] driveway and onto the South Site . . . .
>
> .        .        .
>
> On this day, JSE destroyed at least two dozen trees and other plants on my property.
>
> .        .        .
>
> In addition to the substantial flooding . . . and other damage that JSE caused on the South Site, the Home Site suffered again a similar magnitude of damage as the 2011 event . . . .

---

[7] Plaintiff points to Enman's deposition, where he explains that he "did not concentrate the effort on [JSE]," that he "ha[d] not done enough research to say to what extent that would have or could have further impacted the Krull property," and that his report "largely dealt with the municipal aspect of the infrastructure," which he admitted was "a long way of saying no" to the question of whether there was anything in his written report that was critical of anything JSE did or did not do. Enman depo. at 159:16--160:12. At a later point in his deposition, when asked whether it was "customary," in his experience, "for a road foreman or contractor who is working on a municipal road to dig on a property to divert water" during a road storm, and if that was a technique he would suggest, he responded: "No." Id. at 181:21–182:2. However, that exchange continued:

Q. And it's not something that you have seen before?

A. I have seen it.

Q. You have seen it?

A. Sure.

Q. How many instances of that have you seen?

A. Couldn't count.

Id. at 181:3–181:10. Nothing in the deposition testimony creates a disputed material fact as to whether JSE breached a duty of care in performing work on Economou Road.

[8] The court grants Huntington's motion to strike Plaintiff's "Statement of Disputed Facts by Pl.'s Expert in Opp'n to Summ. J." This document is not a pleading; it was written and signed by Plaintiff's expert, and violates V.R.C.P. 11(a). The court considers only the later statement of facts submitted by Plaintiff and signed by counsel, as well as his expert's affidavit and Plaintiff's own affidavit with supporting materials.

> It did not appear to me on July 3, 2013 that JSE was attempting to dig a ditch to the brook as he would have had to have gone much further across the property, for water to reach the brook. In addition, a simple assessment, from out of the excavator, of the land slope shown in Exhibit 3, would confirm that the slope in that area would direct runoff toward the house site, rather than towards the stream.
>
> .     .     .
>
> In addition to the damages to the South Site, the Home Site suffered similar damage as it had in 2011 due to ongoing maintenance and repair issues on Economou Rd., and because of JSE's actions that day up the road from my home.

Pl.' Aff. ¶¶ 10(d)–(f), 11, 14. Additionally, Plaintiff attaches a number of photographs that he took during and immediately after the 2013 rainstorm, showing the runoff, tracks in the mud from the excavator, and the damage to his property. He also incorporates into his affidavit a narrative, which he wrote in the month following the 2013 rainstorm, and which he asserts is a true and accurate reflection of what happened at the time. Therein, he describes how the excavator arrived and did work on the opposite side of the road from his, and that mud, silt, sediment, and stone flowed across the road into his driveway and house site, "but was limited to the area of previous damage." That narrative then continues, in pertinent part:

> About an hour or so later another crew arrived with the owner of the excavating company, who was operating the excavator. He began excavating the trench created by the first crew, and worked his way up to the bend in the road. At this point water only was flowing across and into the undamaged portion of the house site. The existing berm was filtering muddy water, and the intentional hemlock stand and vegetation were catching stone and silt. At the bend in the road, where a deluge of water and material was flowing into the trench just created, the operator then drove the machine onto our property, through the berm, and dug a trench up the bank and across the road killing a dozen or so hemlocks and releasing all of the water and material flowing down the road into the previously undamaged portion of the house site. I went up the road as he did so. And urgently suggested he needed to repair what was just done and get the flow back on its previous course. He responded, "I think you[']r[e] right and began to fill in his ditch as water and road material ripped through the now broken trees and scared [sic] hillside.

Ex. 10 to Pl.'s Aff. at 2. Viewing the evidence in the light most favorable to the non-moving party, as the court must in deciding a motion for summary judgment, Plaintiff's affidavit and accompanying materials demonstrate a genuinely disputed material fact as to whether JSE was negligent in its actions on July 3, 2013, and whether that alleged negligence was a proximate cause of the damages to Plaintiff's property. It is for the finder of fact to make credibility determinations and settle the discrepancy between Plaintiff's and John Scott Excavating's competing versions of events.

Again, the court acknowledges that Plaintiff's expert, Blair Enman, says nothing about whether JSE was negligent. However, the court is satisfied that Plaintiff himself has sufficient expertise to opine that JSE was negligent, and that its negligence caused his property damage. In the narrative incorporated by reference into his affidavit, Plaintiff states that he is a designer and builder by trade, has a B.A. in architecture, and has worked consistently in the fields of architecture, landscape design, construction, and project management. He worked for four months in Belize following two hurricanes, where he implemented a $1 million erosion control project, and has 20 years of experience in "various land repair and erosion control projects." Plaintiff's affidavit is sufficient for him to survive JSE's motion for summary judgment.

JSE's potential liability is limited, however, to damages incurred as a result of its actions taken during the 2013 rainstorm, as detailed in Plaintiff's affidavit. There is no evidence that it was negligent at any other time.

IV. Trespass by John Scott Excavating

In addition to the negligence claim, Plaintiff also brings a claim for trespass. Trespass is an invasion of one's interest in the exclusive possession of his or her land. John Larkin, Inc. v. Marceau, 2008 VT 61, ¶ 8, 184 Vt. 207 (citing W. Keeton et al., Prosser and Keeton on the Law of Torts § 87, at 622 (5th ed.1984); Restatement (Second) of Torts § 158 cmt. c, at 277 (1965)). "Liability for trespass arises when one intentionally enters or causes a thing to enter the land of another." *See* Canton v. Graniteville Fire Dist. No. 4, 171 Vt. 551, 552 (2000) (citing Restatement (Second) of Torts § 158(a)). The Vermont Supreme Court has recognized that "one who causes water to enter the land of another is liable for trespass. Id.; *see also* S.L. Garand Co. v. Everlasting Memorial Works, Inc., 128 Vt. 359, 360–62 (1970) (treating diversion of water onto another's land as act of trespass). However, "mere entry onto another's land does not in itself constitute a trespass because such entry can be privileged: 'Trespass involves the *unprivileged* entry on to the land in possession of another. By definition, trespass involves conduct that the trespasser has *no right* to engage in . . . .'" Ondovchik Family Ltd. P'ship v. Agency of Transp., 2010 VT 35, ¶ 10, 187 Vt. 556 (quoting Wild v. Brooks, 2004 VT 74, ¶ 17, 177 Vt. 171) (emphases in original); *see also* Restatement (Second) of Torts § 158 cmt. e ("Conduct which would otherwise constitute a trespass is not a trespass if it is privileged."); id. §§ 176–211.

Plaintiff appears to argue that the entry of water, mud, sediment, and gravel from the roadway onto his land, as well as JSE's entry onto his land in performing their contract with the town, both constitute a trespass. Through Plaintiff's affidavit, there is evidence that JSE physically entered Plaintiff's land, and that it invaded Plaintiff's property by permitting water or road material to enter his land. To the extent JSE intentionally entered Plaintiff's land or diverted water or road material through his land, JSE contends that those actions were privileged. *See* Ondovchik, 2010 VT 35, ¶ 10; Restatement (Second) of Torts § 211. In Ondovchik, the Court held that snowplows are engaged in privileged, lawful conduct when plowing roads, because the State has a duty under federal law to remove snow and engage in other routine maintenance of state highways. Ondovchik, 2010 VT 35, ¶ 11. The Court relied on section 211 of the Restatement, which provides:

> A duty or authority imposed or created by legislative enactment carries with it the privilege to enter land in the possession of another for the purpose of performing or exercising such duty or authority in so far as the entry is reasonably necessary to such performance or exercise, if, but only if, all the requirements of the enactment are fulfilled.

Restatement (Second) of Torts § 211. Similarly, here, no one can rationally dispute that the Town has a duty to maintain its roads and culverts during rain storms, including Economou Road. *See* 19 V.S.A. § 310(a) ("A town shall keep its class 1, 2, and 3 highways and bridges in good and sufficient repair during all seasons of the year . . . .").

But this case contains an important distinction from Ondovchik. Here, there is evidence that the actions taken by JSE were not reasonably necessary to such performance of the Town's duty to keep Economou Road in good and sufficient repair. Plaintiff's assertion in his affidavit is that there was no reason for JSE to come 60 feet onto his property and dig a ditch that ended up diverting the runoff directly toward the undamaged portion of his house, and that this action plainly could not have diverted the runoff to the natural stream. Plaintiff has presented evidence which, if believed, could entitle him to relief for a trespass claim.

## V. Conversion

To the extent the Complaint also alleges a conversion, *see* Compl., Count II, ¶ 6 ("Defendants' trespass to at least some of Plaintiff's property amounted to conversion . . . ."), that claim fails. To establish a claim for conversion, the property owner must show "that another has appropriated the property to that party's own use and beneficial enjoyment, has exercised dominion over it in exclusion and defiance of the owner's right, or has withheld possession from the owner under a claim of title inconsistent with the owner's title." Montgomery v. Devoid, 2006 VT 127, ¶ 12, 181 Vt. 154 (quoting P.F. Jurgs & Co. v. O'Brien, 160 Vt. 294, 299 (1993)); *see also* Hegarty v. Addison Cty. Humane Soc., 2004 VT 33, ¶ 9, 176 Vt. 405; Restatement (Second) of Torts § 222A (1965) ("Conversion is an intentional exercise of dominion or control over a chattel which so seriously interferes with the right of another to control it that the actor may justly be required to pay the other the full value of the chattel."). The admissible evidence comes nowhere close to demonstrating that Defendants appropriated Plaintiff's property for their own use and enjoyment, exercised dominion over it in exclusion of Plaintiff's right, or withheld possession under an inconsistent claim of title.

## VI. Damages

Defendants contend that Plaintiff is not entitled to punitive damages or emotional distress damages. Punitive damages require "outrageously reprehensible" conduct accompanied by "malice". *See*, *e.g.*, Fly Fish Vermont, Inc. v. Chapin Hill Estates, Inc., 2010 VT 33, ¶ 18, 187 Vt. 541. There is no evidence of such conduct. Moreover, it appears that Plaintiff concedes that he is not entitled to punitive damages.

As for emotional distress damages, the general rule is that such damages are not allowed for claims of ordinary negligence, absent physical impact or substantial bodily injury or sickness. Vincent v. DeVries, 2013 VT 34, ¶¶ 10–12, 25, & n.2, 193 Vt. 574. There is no such evidence of physical impact or substantial bodily injury or sickness. In fact, Plaintiff testified that he was never in physical danger during the July 2013 rainstorm. Krull depo. at 161:6–15.

## PLAINTIFF'S MOTION TO AMEND COMPLAINT

Plaintiff seeks to amend his complaint. His motion, in addition to numerous stylistic and technical changes that have no potential to affect the court's ruling on summary judgment, proposes five "primary" amendments: (1) the addition of a "spoliation" claim; (2) the addition of a Public Records Act claim; (3) the addition of a claim for injunctive relief; (4) the substitution of the

State of Vermont as a defendant; and (5) the addition of a state law "takings" or inverse condemnation claim.[9]

The Supreme Court and the civil rules have recognized a liberal policy for permitting amendments to the pleadings. *See*, *e.g.*, V.R.C.P. 15(a); <u>Lillicrap v. Martin</u>, 156 Vt. 165 (1991); <u>Hunters, Anglers and Trappers Ass'n of Vermont, Inc. v. Winooski Valley Park Dist.</u>, 2006 VT 82, ¶ 17, 181 Vt. 12 (quoting <u>Bevins v. King</u>, 143 Vt. 252, 254-55 (1983)). However, "'denial of a motion under Rule 15(a) may be justified based upon a consideration of the following factors: (1) undue delay; (2) bad faith; (3) futility of amendment; and (4) prejudice to the opposing party.'" <u>Prive v. Vermont Asbestos Group</u>, 2010 VT 2, ¶ 13, 187 Vt. 280, 286–87 (2010) (quoting <u>Colby v. Umbrella</u>, 2008 VT 20, ¶¶ 12–13, 184 Vt. 1).

<u>Delay and Prejudice</u>

Here, delay and prejudice provide ample grounds to deny the motion to amend. This case has been pending since July of 2015, yet Plaintiff waited approximately two years—after the close of discovery, and only in response to Defendants' motions for summary judgment—to file his motion to amend. Plaintiff offers no compelling reason or good cause for the delay. In fact, he concedes that counsel mentioned his "takings" theory to Defendants' counsel long before the motions for summary judgment motions were filed, but never moved to add that as a claim until July 2017. "[A] motion to amend should be made as soon as the necessity for altering the pleading becomes apparent. A party who delays in seeking an amendment is acting contrary to the spirit of the rule and runs the risk of the court denying permission because of the passage of time." Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1488 (3d ed. (Apr. 2017 update). The proposed amendment would patently prejudice Defendants because it would necessitate an additional round of dispositive briefing after discovery has already closed and motions for summary judgment have been filed. <u>Id</u>. ("As a general rule, the risk of substantial prejudice increases with the passage of time. . . . [P]laintiffs have been denied leave to amend to add new claims or theories when the amendment is sought after the case has been pending for some time, discovery has closed, and the court is about to rule on defendant's summary-judgment motion."); *see also* <u>Gauthier v. Keurig Green Mountain, Inc.</u>, 2015 VT 108, ¶ 47, 200 Vt. 125 (concluding that trial court did not abuse its discretion in denying motion to amend filed almost one year after initiation of suit and two weeks after defendant had moved for summary judgment, where trial court found that plaintiff's proffered justification for delay was not basis for proposed new claims, and that defendant "had already marshaled its resources to respond to the allegations made in the existing complaint") (quotations omitted).

<u>Futility</u>

Moreover, the motion to amend can also be denied because the proposed amendment is futile, with one exception noted below. Generally, to decide whether a proposed amendment is "futile," the court must examine whether plaintiff's amended complaint would survive a Rule 12(b)(6) motion to dismiss. <u>Prive v. Vermont Asbestos Grp.</u>, 2010 VT 2, ¶ 13, 187 Vt. 280. However, courts need not always assess proposed amended pleadings on a 12(b)(6) standard. "In evaluating the futility of amendment, a number of courts have held that a summary judgment standard may be applied and leave to amend denied outright should the party seeking amendment fail to satisfy that standard." <u>Oneida Indian Nation of New York State v. Cty. of Oneida, N.Y.</u>, 199 F.R.D. 61, 88 n.23 (N.D.N.Y. 2000) (quoting <u>Republic Nat'l. Bank v. Hales</u>, 75

---

[9] Plaintiff also appears to argue that his proposed amendment merely clarifies that his negligence and trespass claims already constitute a "takings" claim, rather than adding a totally new "takings" cause of action.

F. Supp. 2d 300, 308 (S.D.N.Y. 1999)). "Other courts . . . have at times allowed amendment, but simultaneously evaluated the amended pleading under the standards governing motions brought pursuant to Rule 56." Id. (quoting Hales, 75 F. Supp. 2d at 309); *see also* Wright & Miller, 6 Fed. Prac. & Proc. Civ. § 1487 (3d ed. Apr. 2017 update) ("several courts have held that if a complaint as amended could not withstand a motion to dismiss *or summary judgment*, then the amendment should be denied as futile") (emphasis added); Montalvo v. Sun Roc Corp., 179 F.R.D. 420, 424 (S.D.N.Y. 1998); Azurite Corp. v. Amster & Co., 844 F. Supp. 929, 939 (S.D.N.Y. 1994), aff'd, 52 F.3d 15 (2d Cir. 1995); Schare v. Six Flags Theme Parks, No. 96 CIV. 9377 (RWS), 1998 WL 24361, at *6 (S.D.N.Y. Jan. 23, 1998) ("Where an amended claim would fail on a summary judgment motion, the court has discretion to treat the opposition to the amendment as a motion for summary judgment and to consider matters outside the pleadings in resolving the motion."); Rogen v. Scheer, No. 86 Civ. 2058 (MJL), 1991 WL 33294, at *3 (S.D.N.Y. Feb.22, 1991).

Virtually all of Plaintiff's proposed amendments are futile, as explained below.

## I.     Spoliation

First, the Supreme Court has never recognized spoliation as an independent cause of action in Vermont. Naylor v. Rotech Healthcare, Inc., 679 F. Supp. 2d 505, 511 (D. Vt. 2009) ("As an issue of first impression, this Court finds no separate cause of action exists under Vermont law for spoliation of evidence."). A discovery sanction is the proper remedy for spoliation. Id.; *cf.* Felis v. Downs Rachlin Martin PLLC, 2015 VT 129, ¶ 19, 200 Vt. 465 ("Although a court can vacate a judgment based on a finding of fraud on the court, a party cannot bring a private cause of action for tort under this theory.").

## II.     Public Records Act

Plaintiff's proposed Public Records Act claim similarly fails. This claim is apparently based only on the allegation that the Town did not create certain records or data. The Act, however, applies only to records already in existence. *See* 1 V.S.A. § 317(b) ("'public record' or 'public document' means any written or recorded information, regardless of physical form or characteristics, which is produced or acquired in the course of public agency business"). It does not mandate the creation of new records.

## III.     Substitution of State of Vermont as Defendant/"Huntington is Not a Town" Argument

Plaintiff next seeks to substitute the State of Vermont as a Defendant in this action on the grounds that Huntington is not a real town. Plaintiff contends that Huntington was never incorporated nor chartered as a Vermont municipality and, therefore, is an unincorporated municipality for which the State is liable. *See* McCord v. City of Pueblo, 5 Colo. App. 48, 53, 36 P. 1109, 1110 (1894) ("The unincorporated agencies occupy the same positions as the state, and are protected to the same extent; but, when any state agency becomes a municipal corporation, it thereby acquires an identity distinct from the state, and is made liable for its own negligence."). In effect, Plaintiff challenges the legal existence of the Town of Huntington.

According to McQuillin:

> An inquiry into the legal existence of a municipality is in general reserved to the state in a proceeding by quo warranto or other direct proceeding. With few exceptions, a private person cannot ordinarily, either directly or indirectly, usurp this function of

government. Private individuals, as taxpayers or otherwise, cannot maintain an action challenging the legality of a municipal corporation, nor can they collaterally attack its existence where it is at least a de facto corporation. However, private parties may [have] standing in cases involving attacks on municipal incorporations and annexations only when the action complained of is void, rather than merely voidable, because the municipality exceeded its authority. Still, the law does not favor collateral attack on a municipal corporation in the exercise of police powers, and the court in such case need only ascertain its existence de facto.

1 McQuillin Mun. Corp. § 3:107 ("Attack on corporate existence") (3d ed. July 2017 update).

Historical research reveals that 23,040 acres making up "New Huntington" was chartered to Edward Burling and 65 others on June 7, 1763, from Benning Wentworth, governor of the New Hampshire province, under the authority of King George III. State Papers of New Hampshire, 26:232–35. New Huntington's first settlers arrived in 1786, and the town was organized and its first town meeting was held on March 29, 1790. Hamilton Child, Gazetteer and Business Directory of Chittenden County, 218–19 (1882). Jehial Johns was elected to represent New Huntington in the General Assembly in 1791. Journal of the Proceedings of the General Assembly of the State of Vermont (Oct. 13, 1791), reprinted at State Papers of Vermont, 3(5): 5. The town has had a representative in the Legislature ever since. Leonard Dening, Catalogue of the Principal Officers of Vermont, 34–46 (1851). In 1794, the General Assembly recognized New Huntington's elected town officers. Laws of 1794, "An Act Establishing the Town Officers in the Town of Burlington, Williston, New Huntington and Jericho" (Oct. 29th, 1794), reprinted at State Papers of Vermont, 15:316. On October 27, 1795, the Vermont General Assembly changed its name from "New Huntington" to "Huntington." Laws of 1795, "An Act Altering the Name of New Huntington to that of Huntington" (Oct. 27, 1795), reprinted at State Papers of Vermont, 15:425.

The above historical sources conclusively demonstrate that Huntington was chartered as a municipal corporation in 1763, and has been treated as such by the state legislature since the founding of Vermont. Even assuming there were insufficient evidence of incorporation, it is clear that, at the very least, Huntington is a de facto corporation, subject to challenge only in a direct action by the State. 1 McQuillin Mun. Corp. § 3:107. The court further observes that the Vermont Supreme Court has implicitly recognized that Huntington is an incorporated town, with the ability to sue and be sued. *See, e.g.*, Town of Jericho v. Town of Huntington, 79 Vt. 329 (1906); Town of Huntington v. Chesmore, 60 Vt. 566 (1888); Town of Starksboro v. Town of Huntington, 50 Vt. 599 (1878); Town of Huntington v. Town of Charlotte, 15 Vt. 46, 50 (1843). Moreover, Vermont has 237 towns, 9 cities, 5 unincorporated towns, and 4 gores. Of the 246 incorporated cities and towns, only about 60 have municipal charters that are codified in the appendix to Title 24. Under Plaintiff's logic, approximately three quarters of Vermont's cities and towns are unincorporated municipalities, for which the State is liable. The court rejects this logic. Huntington and about 190 other municipalities that are not listed in the Title 24 appendix can rest assured knowing that they are, in fact, municipal corporations.

Plaintiff's attempt to add the State as a party appears to be based only on the false premise that Huntington is not an incorporated municipality. The court could join the State if there were some independent basis by which the State could be liable. However, Plaintiff has provided no such evidence. Because the motion to join the State (# 21) arises from the same argument raised in the motion to amend, the motion to join is also denied.

## IV. Takings/Inverse Condemnation Claim

Plaintiff seeks to add a state law "takings"/inverse condemnation claim. *See* Vt. Const. ch. I, art. 2 ("[P]rivate property ought to be subservient to public uses when necessity requires it, nevertheless, whenever any person's property is taken for the use of the public, the owner ought to receive an equivalent in money."). Plaintiff pursues this approach presumably because the "doctrine of immunity from liability does not apply where the injury complained of is the taking of private property for public use without compensation." Griswold v. Town Sch. Dist. of Town of Weathersfield, 117 Vt. 224, 226 (1952). Liability under the constitutional takings provision "is not dependent on negligence but on the taking of private property and this unlawful taking gives the right of action." Id. at 227.

The purpose of the Takings Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960). Thus, a property owner subject to a taking is entitled to just compensation. However, "not every 'invasion' of private property resulting from government activity amounts to an appropriation." Ondovchik Family Ltd. P'ship v. Agency of Transp., 2010 VT 35, ¶ 16, 187 Vt. 556 (citing Ridge Line, Inc. v. United States, 346 F.3d 1346, 1355 (Fed. Cir. 2003)). Instead, the Supreme Court has outlined a two-part test to determine when government conduct amounts to a potential taking: (1) "a property loss compensable as a taking only results when the government intends to invade a protected property interest or the asserted invasion is the direct, natural, or probable result of an authorized activity and not the incidental or consequential injury inflicted by the action," id. (citing Ridge Line, 346 F.3d at 1355); and (2) "[e]ven where the effects of the government are predictable, to constitute a taking, an invasion must appropriate a benefit to the government at the expense of the property owner, or at least preempt the owners['] right to enjoy his property for an extended period of time, rather than merely inflict an injury that reduces its value." Regan v. Spector, 2016 VT 116, ¶ 18 (citing Ridge Line, 346 F.3d at 1355–56). The Court has further emphasized that: (1) "temporary, repeated incursions can sometimes rise to the level of a taking, but only in instances where the incursions amount to the taking of an easement"; (2) "courts generally find a taking of an easement only when the government requires an 'onerous' dedication of property"; and (3) "[w]hen the intrusion is 'limited and transient' in nature and occurs for legitimate governmental reasons, it does not amount to a taking." Id. (citing Ondovchik, 2010 VT 35, ¶ 18); *see also* Ridge Line, 346 F.3d at 1354 (recognizing that intermittent flooding of private land can in some circumstances constitute taking of an easement).

Vermont law in this area has evolved. In Timms v. State, the landownder's well was destroyed by the state's non-negligent salting of roads, and the Supreme Court held that to be a taking, noting that "[p]ermanent physical damage to property to the point of depriving the owner of its beneficial use constitutes a taking." 139 Vt. 343, 344–45 (1981) (citing Griswold, 117 Vt. at 226; Sanborn v. Village of Enosburg Falls, 87 Vt. 479, 483–84 (1914)). Nearly three decades later, the Court overruled Timms, observing that it had become an outlier, and that the Timms Court had improperly failed to draw a distinction between "permanent physical occupation" and "more temporary invasion" in finding a taking "based upon the consequential damages of lawful salting activities that the government performed on its own property." Ondovchik Family Ltd. P'ship v. Agency of Transp., 2010 VT 35, ¶ 15, 187 Vt. 556 (citing T. Goger, Annot., Salting for Snow Removal as Taking or Damaging Abutting Property for Eminent Domain Purposes, 64 A.L.R.3d 1239 (1975); Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 428 (1982)) *see also* Loretto, 458 U.S. at 428 ("[T]his Court has consistently distinguished between flooding cases involving a permanent physical occupation, on the one hand, and cases involving a more

temporary invasion, or government action outside the owner's property that causes consequential damages within, on the other. A taking has always been found only in the former situation.").

The facts of Ondovchik bear some similarity to the present case. There, the landowner alleged damage to its building from snow throw and contaminated water runoff resulting from defendant's snowplowing of the highway, which it argued constituted a taking. Id. ¶¶ 1, 4. The Court rejected this argument and affirmed the trial court's dismissal of the inverse condemnation claim, stating:

> Here, landowner does not claim that defendant has authorized a permanent occupation, intrusion, or appropriation of landowner's property such that it permanently ousts landowner from possession. Rather, landowner alleges that legitimate governmental activities *outside* of landowner's property occasionally intrude upon and damage landowner's property. Any damages from such activities are purely consequential, and landowner's complaint therefore lacks any facts or circumstances that would allow for recovery under a claim of inverse condemnation. Even when viewing the facts in the light most favorable to landowner, there is no allegation that defendant has created a permanent physical occupation of landowner's property.

Id., ¶ 17 (citing Ridge Line, 346 F.3d at 1355–56) (emphasis in original). The Court further observed that the landowner made "no claim . . . that defendant [took] an easement by allowing snow throw to intermittently and temporarily intrude on landowner's property." Id. ¶ 18.

Applying the test articulated in Ondovchik and Regan here, the court first notes there is no evidence that the Town intended to invade Krull's protected property interest. The operative question, instead, is whether the "invasion" of gravel, mud, and sediment from the road onto Krull's property is the "direct, natural, or probable result of an authorized activity" or the "incidental or consequential injury inflicted by the action." Regan, 2016 VT 116, ¶ 18; Ondovchik, 2010 VT 35, ¶ 16. Under this distinction, the court cannot conclude that the "invasion" asserted here was the "direct, natural, or probable result" of the Town's actions. Without diminishing the magnitude and severity of the damage sustained by Krull's property, the court must conclude that this damage was incidental or consequential to the Town's actions in maintaining Economou Road. The caselaw compels this result. *See* Omnia Commercial Co. v. United States, 261 U.S. 502, 510 (1923) ("for consequential loss or injury resulting from lawful governmental action the law affords no remedy"). The proposed takings claim fails as a matter of law and, accordingly, amending the complaint to add that claim would be futile. Assuming the complaint already states a takings claim and that the proposed amendment merely provides clarification, as Plaintiff contends, there is no evidence of a constitutional taking sufficient to survive summary judgment.

To the extent Plaintiff alleges a regulatory taking, that claim would also be futile. "The application of a general zoning law to particular property effects a taking if the ordinance does not substantially advance legitimate state interests or denies an owner economically viable use of his land." Chioffi v. City of Winooski, 165 Vt. 37, 41 (1996) (quoting Agins v. City of Tiburon, 447 U.S. 255, 260 (1980)). Plaintiff has not identified any actual land-use regulation that negatively affected or affects his property.

Finally, to the extent that Plaintiff's proposed takings claim is alleged against JSE in addition to the Town, it is also futile. A takings claim can be brought only against a government

16

entity with the power of eminent domain, not against a private entity. Plaintiff's remedy against JSE, if any, falls within the realm of tort law (i.e., his negligence and trespass claims, discussed above). Nor can any potential negligence by JSE be imputed to the Town to form the basis for a takings claim.[10]

## V.        Declaratory and Injunctive Relief

Plaintiff also seeks to add a claim for what he calls "Injunctive & Declaratory Relief on All Counts." Pl.'s Proposed Am. Compl. ¶¶ 67–73. "'Injunctive relief' is not an independent cause of action, but a request for a particular remedy that is dependent on some valid, underlying cause of action." Albertine v. Churchview Estates, LLC., No. 591-5-14 Cncv, 2016 WL 9403907, *3 n.4 (Vt. Super. Aug. 12, 2016) (Toor, J.), motion to reconsider granted on other grounds, 2016 WL 5816181 (Sept. 28, 2016) (Mello, J.); *see also* In re Joint E. & S. Dist. Asbestos Litig., 14 F.3d 726, 731 (2d Cir. 1993) (emphasis supplied); *see also* Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1127 (11th Cir. 2005); Springfield Hosp. v. Hofmann, No. 5:09-CV-254, 2011 WL 3421528, at *2 (D. Vt. Aug. 4, 2011), aff'd, 488 F. App'x 534 (2d Cir. 2012) ("a request for injunctive relief is not a separate cause of action"). Similarly, declaratory relief also requires the existence of some valid, underlying substantive claim. *See* Vermont State Employees' Ass'n, Inc. v. Vermont Criminal Justice Training Council, 167 Vt. 191, 194 (1997) (Declaratory Judgment Act "does not increase or enlarge the jurisdiction of the court over any subject matter or parties"); Williams v. State, 156 Vt. 42, 60 (1990) ("[T]he availability of declaratory relief turns on whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment. A mere abstract question or hypothetical threat is not a sufficient basis for a declaratory judgment.") (citation and quotation omitted); Chiste v. Hotels.com L.P., 756 F. Supp. 2d 382, 406 (S.D.N.Y. 2010) ("Declaratory judgments and injunctions are remedies, not causes of action.").

Plaintiff's proposed amended complaint states that he seeks declaratory and injunctive relief to "ensure the prevention of future temporary or permanent takings by requiring that certain minimum care is taken with respect to water runoff management in the area of Plaintiff's home . . . ." Pl.'s Proposed Am. Compl. ¶ 73. His request for injunctive relief includes the following specific practices:

(1) requiring the completion of an engineering analysis and report before any road grading or culvert or ditch repair or replacement;

(2) that any such report shall provide recommendations of repairs needed to ensure systems can handle at least once-in-25-year rain events;

(3) that any such recommendations shall be followed;

(4) that engineering reports, evidence of work performed, and all related materials shall be retained for at least 25 years; and

(5) that Defendants shall provide appropriate compensation when the road cannot be properly managed without a taking or other infringement of property rights.

---

[10] The court concludes that a site visit is not necessary to rule on Plaintiff's takings claim, or on any of the other claims. The court can make a sufficiently informed decision based on the materials submitted by the parties, including the various photographs and maps of the property. Plaintiff's motion for a site visit is denied.

17

Id. ¶ 73(a)–(e).

Because all of Plaintiff's underlying claims against the Town of Huntington fail as a matter of law, he is not entitled to any injunctive or declaratory relief against the Town. Indeed, to the extent he seeks declaratory relief, his proposed claim is futile, as it would effectively result in the court issuing an impermissible advisory opinion. *See* Williams, 156 Vt. at 59–60 ("Without such justiciable controversy being present, the declaratory judgment can provide no more than an advisory opinion, which our State judiciary does not have the constitutional power to render.").

The only proposed request for injunctive or declaratory relief that could conceivably apply to John Scott Excavating is the request to "provide appropriate compensation when the road cannot be properly managed without a taking or other infringement of property rights." Assuming that this could be a proper type of declaratory or injunctive relief, it is duplicative and adds nothing to the case. If Plaintiff proves that JSE is liable for some infringement of property rights as part of his negligence or trespass claim, appropriate compensation in the form of damages is the remedy. The court does not see what purpose the proposed declaratory or injunctive relief would serve.

## VI.     Other Proposed Amendments

For the sake of completeness, the court also briefly addresses additional proposed amendments sought by Plaintiff, and which were not fully briefed by Defendants. It appears that Plaintiff attempts to add a claim under the Common Benefits Clause of the Vermont Constitution. *See* Vt. Const. ch. I, art. VII ("That government is, or ought to be, instituted for the common benefit, protection, and security of the people, nation, or community, and not for the particular emolument or advantage of any single person, family, or set of persons, who are a part only of that community . . . ."). A constitutional tort action under Article 7 "is not designed to review the discretionary decisions of another branch of government but to remedy harms caused when a governmental body acts in a wholly arbitrary and unjustified manner in violation of Article 7." In re Town Highway No. 20, 2012 VT 17, ¶ 38, 191 Vt. 231. Thus, it is "not sufficient" for a Common Benefits Clause plaintiff "simply to show that he or she lacks a remedy adequate to vindicate the interest asserted." Id. ¶ 37. The plaintiff must also show the denial of a common benefit accompanied by "disparate and arbitrary treatment when compared to others similarly situated," that "the denial directly favors another particular individual or group," and that "the decision was wholly irrational and arbitrary [and] actuated by personal motives unrelated to the duties of the defendant's official position, such as ill will, vindictiveness, or financial gain." Id. Simply stated, there is no admissible evidence in the record that any actions taken by the Town were "motivated solely by an actual desire to harm the plaintiff or by other unjustified personal motives such as self-enrichment or the enrichment of others." Id. ¶ 38; *see also* id. ¶ 45 (finding Article 7 violation by town selectboard in light of "relentless bias" and "invidious[] discriminat[ion]" against landowner and in favor of others, which denied plaintiff access to his property for many years).

Plaintiff also adds factual allegations concerning stress and anxiety suffered by his daughter as apparently contributing to his own emotional distress. Pl.'s Proposed Am. Compl. ¶ 44. As discussed above in addressing Defendants' summary judgment motions, this amendment would be futile. *See* Vincent v. DeVries, 2013 VT 34, ¶¶ 10–12, 25, & n.2, 193 Vt. 574.

Additionally, Plaintiff seeks to amend his complaint by adding a claim under the timber trespass statute, 13 V.S.A. § 3606. That statute provides:

> In addition to any other civil liability or criminal penalty allowed by law, if a person cuts down, fells, destroys, removes, injures, damages, or carries away any timber placed or growing for any use or purpose whatsoever, or forest products standing, lying, or growing belonging to another person, without permission from the owner of the timber or forest product, or cuts out, alters, or defaces the mark of a log or other valuable forest product, the party injured may recover of such person, in an action on this statute, treble damages for the value of the timber or forest product, and any damage caused to the land or improvements thereon as a result of such action.

13 V.S.A. § 3606(a). The goal of the statute, which applies only to trespassers, *see* Masters v. Stone, 134 Vt. 529, 532 (1976), is "to deter intentional trespass and the wrongful taking of another's timber." Stanley v. Stanley, 2007 VT 44, ¶ 12, 181 Vt. 527 (citing State v. Singer, 2006 VT 46, ¶ 11, 180 Vt. 104). The Supreme Court has described the "intended targets" of the timber trespass statute as "those 'tree pirates' and "arboreal rustlers' who trespass on another's property and remove timber to which they have no right." Id. (quoting Singer, 2006 VT 46, ¶ 11).

While the plain language of the statute is broad, it is inapplicable in this case. There is evidence that John Scott destroyed several trees on Plaintiff's property, and that this caused increased water flow toward Plaintiff's house. But John Scott Excavating is clearly not a "tree pirate" or "arboreal rustler" within the meaning of the timber trespass statute. Id. ¶ 12. Again, the purpose of the statute is "to deter intentional trespass and the wrongful taking of another's timber." Id. There is no evidence that JSE entered Plaintiff's land for the purpose of destroying or taking his timber. The evidence instead reflects, at most, negligent destruction of several of Plaintiff's trees while trying to divert the flow of water and road materials during a rainstorm. This is not the type of situation to which the timber trespass statute was intended to apply. Moreover, if the finder of fact concludes that JSE is liable to Plaintiff for negligence, Plaintiff would likely be awarded damages for destruction of the trees in any event. The addition of a claim under the timber trespass statute would be futile.

The remaining proposed amendments represent an attempt to beef up the factual allegations, or are merely stylistic in nature. As Plaintiff states, these amendments are "largely not substantive, or perhaps even necessary at this time, but are being provided out of caution, and to better inform the parties of Plaintiff's position." Pl.'s Mot. to Am. Compl. at 1. Given that discovery ended months ago, it is not clear that these proposed amendments would change anything. As these remaining amendments appear to serve no purpose and are, in Plaintiff's own words, "not . . . even necessary," they are futile.

<u>PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT</u>

Plaintiff moves for partial summary judgment on 3 of the 19 total affirmative defenses raised by Huntington in its Answer: (1) the two-year statute of limitations under 12 V.S.A. § 514; (2) the limitation of damages under 19 V.S.A. § 985; and (3) the failure to provide notice under 19 V.S.A. § 987. Because the court has decided above that all of Plaintiff's claims against the Town fail as a matter of law and that Huntington's motion for summary judgment will be granted, it appears that Plaintiff's Motion for Partial Summary Judgment as to the Town's affirmative defenses is moot. For the sake of completeness, however, the court notes that the parties already agreed on the inapplicability both section 985 and 987, which apply only to a person injured while travelling over a defective bridge or culvert, *see* Thompson v. Town of Stannard, 125 Vt. 140, 143

19

(1965), and that the court would have denied Plaintiff's motion as to § 514 for failure to establish undisputed material facts in support of his motion.

Order

Defendant Town of Huntington's motion for summary judgment (# 10) is granted.

Defendant John Scott Excavating's motion for summary judgment (# 12) is granted in part and denied in part. The motion is denied as to actions taken by John Scott Excavating during the rainstorm on July 3, 2013 (as discussed above), which the court concludes raise a disputed material fact as to the negligence and trespass claims. The motion is granted in all other respects.

Plaintiff's motion to amend his complaint (# 13) is denied.

Plaintiff's motion for partial summary judgment (# 15) is moot.

Plaintiff's motion to join the State of Vermont (# 21) is denied.

Plaintiff's motion for a site visit (# 25) is denied.

The clerk will schedule a pre-trial conference, for the purpose of setting a trial date and addressing any other necessary issues. As neither party has requested a jury trial, this matter will be decided at a bench trial.

SO ORDERED this 22nd day of December, 2017.


_____
Robert A. Mello
Superior Court Judge